**ORAL ARGUMENT REQUESTED**

No. 14-3179

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**
_____

LEE ANN HELFRICH,

*Plaintiff-Appellant,*

v.

BLUE CROSS AND BLUE SHIELD ASSOCIATION, and BLUE CROSS AND
BLUE SHIELD OF KANSAS CITY,

*Defendants-Appellees.*
_____

On Appeal from the United States District Court for the District of Kansas
The Honorable Eric F. Melgren, District Judge
(D.C. No. 13-2620-EFM-JPO)
_____

**BRIEF OF APPELLANT LEE ANN HELFRICH**
_____

Matthew W.H. Wessler
PUBLIC JUSTICE, P.C.
1825 K Street, NW, Suite 200
Washington, DC 20006
(202) 797-8600

Sarah E. Belton
PUBLIC JUSTICE, P.C.
555 12th Street, Suite 1230
Oakland, CA 94607
(510) 622-8150

David A. Hoffman
Donald W. Vasos
VASOS LAW OFFICES
4400 Shawnee Mission Parkway,
Suite 100
Fairway, KS 66025
(913) 362-4400

*Counsel for the Appellant*

November 19, 2014

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY ...................................................................................... 1

PRIOR OR RELATED APPEALS .......................................................... 2

JURISDICTIONAL STATEMENT ........................................................ 3

STATEMENT OF THE ISSUE ............................................................. 5

INTRODUCTION ............................................................................. 6

STATEMENT OF THE CASE ............................................................. 9

A.    Statutory Background ........................................................... 9

B.    This Litigation ..................................................................... 19

SUMMARY OF ARGUMENT .......................................................... 24

STANDARD OF REVIEW ............................................................... 26

ARGUMENT ................................................................................. 26

I.    The District Court Erred by Failing to Apply the Presumption Against Preemption ......................................................................... 26

   A. The Presumption Against Preemption Requires that Courts Accept the Reading of a Preemption Provision that Disfavors Preemption. ................ 26

   B. Section 8902(m)(1) Is a Classic Example of an Express Preemption Clause To Which the Presumption Should Apply. ................................................. 31

II.    The District Court Was Wrong to Read § 8902(m)(1) Expansively. .......... 38

   A.  The District Court Disregarded *McVeigh.* .................................... 38

   B. Section 8902(m)(1)'s "Relate To" Language is Neither Broad Nor Expansive. ............................................................................. 42

i

C.   The Congressional Purpose Behind § 8902(m)(1) Convincingly Demonstrates that Congress Did Not Intend to Create a Broad Preemption Provision. ........................................................................................53

III.    The District Court's Rule of Preemption Violates the Supremacy Clause....57

CONCLUSION .........................................................................................60

REQUEST FOR ORAL ARGUMENT ...................................................61

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................62

CERTIFICATE OF DIGITAL SUBMISSION .......................................63

CERTIFICATE OF SERVICE ................................................................64

# TABLE OF AUTHORITIES

## Cases

*AD Global Fund, LLC v. United States*, 67 Fed. Cl. 657 (2005)............................54

*Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004)....................................................44

*Allstate Ins. Co. v. Druke*, 576 P.2d 489 (Ariz. 1978)..............................................18

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008) .................................................. *passim*

*Am. Airlines v. Wolens*, 513 U.S. 219 (1995) ................................................... 48, 58

*Am. Contractors Indem. Co. v. Saladino*, 115 Cal. App. 4th 1262
   (Cal. Ct. App. 2004)..............................................................................................18

*Am. Ins. Ass'n. v. Garamendi,* 539 U.S. 396 (2003) ...............................................29

*Arizona v. Inter Tribal Council of Arizona, Inc.*, ——U.S.——, 133 S.Ct. 2247
   (2013) ....................................................................................................................41

*Arthur D. Little, Inc. v. Comm'r of Health and Hosps.*, 481 N.E. 2d 441 (1985)...58

*Bates v. Dow Agrosciences LLC,* 544 U.S. 431 (2005).................................. *passim*

*Blue Cross & Blue Shield v. Dailey*, 687 N.W.2d 689 (Neb. 2004).......................18

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141 (1989)...................29

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001)..............................29

*Carpenters Local Union No. 26 v. U.S. Fidelity Guar. Co.*, 215 F.3d 136
   (1st Cir. 2000) ......................................................................................................47

*Chamber of Commerce v. Whiting*, 131 S.Ct. 1968 (2011).............................. 29, 35

*Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363 (2000)...............................29

*CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993) ..........................................30

*CTS Corp. v. Waldburger*, 134 S.Ct. 2175 (2014) ......................................... *passim*

*Dimick v. Lewis*, 497 A.2d 1221 (N.H. 1985) ........................................................18

*Dist. No. 1 Pac. Coast Dist. v. Travelers Cas. & Sur. Co.*, 782 A.2d 269
(D.C. 2001) ......................................................................................................18

*Ditomasso v. Ocean State Physicians Health Plan, Inc.*, No. 87-2467, 1988 WL
1016798 (R.I. Super. Ct. May 5, 1988) .............................................................22

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*,
485 U.S. 568 (1988) ..........................................................................................59

*Empire HealthChoice Assur. Inc. v. McVeigh,* 547 U.S. 677 (2006) ............. *passim*

*Empire HealthChoice Assur. Inc. v. McVeigh*, 396 F.3d 136
(2d Cir. 2005) ................................................................... 26, 30, 58, 59

*Ex parte State Farm Fire & Cas. Co.*, 764 So. 2d 543 (Ala. 2000) .......................18

*Fort Wayne Cmty. Schs. v. Fort Wayne Educ. Ass'n, Inc.*, 977 F.2d 358
(7th Cir. 1992).................................................................................................45

*Gottlieb v. Carnival Corp.*, 436 F.3d 335 (2nd Cir. 2006) ............................... 39, 48

*Great Am. Ins. Co. v. United States,* 575 F.2d 1031 (2d Cir.1978).........................33

*Grider v. Abramson*, 180 F.3d 739 (6th Cir. 1999) ...................................................33

*Hare v. State*, 733 So. 2d 277 (Miss. 1999)............................................................18

*In re Baker*, 430 F.3d 858 (7th Cir. 2005) ..............................................................39

*In re Zyprexa Prods. Liab. Litig.*, 451 F.Supp. 2d 458 (E.D.N.Y. 2006)...............52

*Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133 (1990) .......................... 44, 45, 55

*Integrity Mgmt. Int'l, Inc. v. Tombs & Sons, Inc.*, 836 F.2d 485 (10th Cir. 1987)..30

*Julson v. Federated Mut. Ins. Co.,* 562 N.W.2d 117 (S.D. 1997) ..........................18

*Kanawha Valley Radiologists, Inc. v. One Valley Bank, N.A.*, 557 S.E.2d 277
(W. Va. 2001) ..................................................................................................18

iv

*Kobold v. Aetna Life Ins. Co.*, 309 P.3d 924 (Ariz. Ct. App. 2013) ............. 8, 36, 44

*Legal Envtl. Assistance Found., Inc. v. U.S. E.P.A.*, 276 F.3d 1253
  (11th Cir. 2001) ........................................................................... 45

*Liberty Mut. Ins. Co. v. Donegan*, 746 F.3d 497 (2d Cir. 2014) ............................ 47

*Lorillard Tobacco Co. v. Reilly*, 553 U.S. 525 (2001) ............................................. 30

*Medtronic v. Lohr*, 518 U.S. 470 (1996) .................................................... 27, 30, 35

*Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985) .................................. 32

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ........................... 47, 48

*Morstein v. Nat. Ins. Svcs., Inc.*, 93 F.3d 715 (11th Cir. 1996) .............................. 47

*Murphy v. Dulay*, 768 F.3d 1360 (11th Cir. 2014) .................................................. 36

*N. Buckeye Educ. Council Grp. Health Benefits Plan v. Lawson*,
  798 N.E.2d 667 (Ohio Ct. App. 2003) ................................................................. 18

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ............................................................................................. 51

*Nevils v. Grp. Health Plan, Inc.*, 418 S.W.3d 451 (Mo. 2014) ...................... *passim*

*New England Health Care Emps. Union v. Mount Sinai Hosp.*, 65 F.3d 1024
  (2d Cir. 1995) ....................................................................................................... 49

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
  514 U.S. 645 (1995) ....................................................................................... *passim*

*O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79 (1994) ............................................. 47

*Perreira v. Rediger*, 778 A.2d 429 (N.J. 2001) ..................................................... 18

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987) ............................................... 44

*Printz v. United States*, 521 U.S. 898 (1997) ............................................. 26, 30, 31

*Ramsey Winch Inc. v. Henry,* 555 F.3d 1199 (10th Cir. 2009) ............................... 30

*Reno v. Flores*, 507 U.S. 292 (1993) .......................................................59

*Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180 (4th Cir. 2007) ...................32

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) .............................. 28, 31, 33

*Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008).........................................................30

*Roach v. Mail Handlers Ben. Plan*, 298 F.3d 847 (9th Cir. 2002).........................45

*Roberts v. Richard*, 743 So. 2d 731 (La. Ct. App. 1999) ........................................18

*Rowe v. N.H. Motor Trans. Ass'n*, 552 U.S. 364 (2008) .........................................47

*Ruckel v. Gassner*, 646 N.W.2d 11 (Wis. 2002).......................................................18

*Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355 (2002)...................................32

*Sec. & Exch. Comm'n v. Variable Annuity Life Ins. Co. of Am.*,
   359 U.S. 65 (1959) .................................................................................32

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984) ..................................... 29, 43

*Skauge v. Mountain States Tel. & Tel. Co.*, 565 P.2d 628  (Mont. 1977) ..............18

*Soc'y of Separationists v. Pleasant Grove City*, 416 F.3d 1239 (10th Cir. 2005)...26

*Stancil v. Erie Ins. Co.,* 740 A.2d 46 (Md. Ct. Spec. App. 1999) ..........................18

*Standard Accident Ins. Co. v. Pellecchia*, 104 A.2d 288 (N.J. 1954) ....................33

*Swanson v. Hartford Ins. Co.*, 46 P.3d 584 (Mont. 2002).......................................18

*Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222 (10th Cir. 2011) ..............30

*Tomlinson v. Cont'l Cas. Co.*, 77 P.3d 628 (Okla. Civ. App. 2003).......................18

*Travelers Indem. Co. v. Chumbley*, 394 S.W.2d 418 (Mo. Ct. App. 1965) ..... 20, 36

*Trustees of AFTRA Health Fund v. Biondi*, 303 F.3d 765 (7th Cir. 2002).............47

*U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491 (1993)............................................29

*United States v. Yazell*, 382 U.S. 341 (1966)..................................................... 49, 58

*United States v. Locke*, 529 U.S. 89 (2000)................................................29

*Wadsworth v. Allied Prof'ls Ins. Co.*, 748 F.3d 100 (2d Cir. 2014)......................29

*West Virginia ex. Rel. McGraw v. CVS Pharm.*, 748 F.Supp.2d 580
  (S.D. W.Va. 2010)........................................................................58

*Wilburn Boat Co. v. Fireman's Fund Ins.*, 348 U.S. 310 (1955)..........................32

*York v. Sevier Cnty. Ambulance Auth., Inc.*, 8 S.W.3d 616 (Tenn. 1999)..............18

*Zahl v. Harper*, 282 F.3d 204  (3d Cir. 2002)..........................................32

*Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81 (2007) ......................53

**Constitutional Provision**

U.S. Const. Art. VI, cl. 2..........................................................................57

**Statutes and Regulations**

5 U.S.C. § 8901(7) ....................................................................................9

5 U.S.C. § 8902(a) ....................................................................................9

5 U.S.C. § 8902(d) ....................................................................................9

5 U.S.C. § 8902(e) ....................................................................................9

5 U.S.C. § 8902(m)(1) ...................................................................... *passim*

5 U.S.C. § 8906(b)(1)................................................................................10

5 U.S.C. § 8906(b)(2)................................................................................10

5 U.S.C. § 8906(f)....................................................................................10

5 U.S.C. § 8909(a) ...................................................................................10

5 U.S.C. § 8913(a) ...................................................................................50

28 U.S.C. § 1332(a)(1) ........................................................... 3, 22

28 U.S.C. § 1442(a)(1) ...............................................................22

29 U.S.C. § 1144(a) ...................................................................43

33 U.S.C. § 933 ..........................................................................51

42 U.S.C. § 1396a ......................................................................51

20 C.F.R. §§ 10.705-10.719 .......................................................51

42 C.F.R. §§ 433.135 .................................................................51

48 C.F.R. §§1602.170-2 .............................................................10

48 C.F.R. §§1602.170-7 .............................................................10

48 C.F.R. § 1602.170-11 ............................................................10

48 C.F.R. § 1631.200 .................................................................11

48 C.F.R. §§ 31.201-5 ...............................................................11

48 C.F.R. 1631.201-70(a) ..........................................................11

48 C.F.R. 1631.201-70(g) ..........................................................11

48 C.F.R. 1652.216-71(b)(2) ......................................................11

11 N.C. Admin. Code 12.0319 ...................................................18

Conn. Gen. Stat. Ann. § 52-225c ...............................................17

Kan. Admin. Regs. § 40-1-20 .............................................. *passim*

Kan. Admin. Regs. §§ 40-1-1 to 40-16-2 ...................................17

Kan. Stat. Ann. § 40-103 ............................................................17

Kan. Stat. Ann. § 40-3107 ..........................................................20

Minn. Stat. Ann. § 62A.095 subd. 2(1)...................................................................18

N.Y. Gen. Oblig. Law § 5-335...............................................................................17

Va. Code Ann. § 38.2-3405 .................................................................................18

**Legislative History**

H.R. Rep. No. 95-282 (1978)......................................................................... 12, 15

H.R. Rep. No. 100-917 (1988)...............................................................................52

H.R. Rep. No. 105-374 (1998)...............................................................................16

H.R. Rep. No. 108-178(II) (2003) .........................................................................53

S. Rep. No. 95-903 (1978) ........................................................................... *passim*

S. Rep. No. 105-257 (1998) ........................................................................... 16, 52

**Other Authorities**

Annie L. Mach & Ada S. Cornell, Cong. Research Serv., *Federal Employees Health Benefits Program (FEHBP): Available Health Insurance Options* (2013), *available at* http://fas.org/sgp/crs/misc/RS21974.pdf ..................... 10, 11

Brendan S. Maher & Radha A. Pathak, *Understanding and Problematizing Contractual Tort Subrogation*, 40 Loy. U. Chi. L.J. 49 (2008) ..........................34

Bryan Ford, *The Uncertain Case for Market Pricing of Health Insurance*, 74 B.U. L. Rev. 109 (1994)...............................................................................11

Elaine M. Rinaldi, *Apportionment of Recovery Between Insured and Insurer in a Subrogation Case*, 29 Tort & Ins. L.J. 803 (1994)................................................34

Jeffrey A. Greenblatt, Comment, *Insurance and Subrogation: When the Pie Isn't Big Enough, Who Eats Last?*, 64 U. Chi. L. Rev. 1337 (1997).................... 33, 34

Kan. Att'y Gen. Op. No. 84-35..............................................................................17

Kenneth S. Abraham & Kyle D. Logue, *The Genie and the Bottle: Collateral Sources Under the September 11th Victim Compensation Fund*, 53 DePaul L. Rev. 591 (2003) ....................................................................................33

Miriam J. Laugesen et al., *A Comparative Analysis of Mandated Benefit Laws*, 1949-2002, 41 Health Services Research 1081, 1090 (2006) *available at* http://www.ncbi.nlm.nih.gov/pmc/ articles/PMC1713218/pdf /hesr041-1081.pdf ..............................................................................................12

M.L. Marasinghe, *An Historical Introduction to the Doctrine of Subrogation: The Early History of the Doctrine I*, 10 Val. U. L. Rev. 45 (1975) ............................34

M.L. Marasinghe, *An Historical Introduction to the Doctrine of Subrogation: The Early History of the Doctrine II*, 10 Val. U. L. Rev. 275 (1976) ........................34

Report of the Comptroller General of the United States, B-164562, *Conflicts Between State Health Insurance Requirements and Contracts of the Federal Employees Health Benefits Carriers* 3 (1975), *available at* http://www.gao.gov/assets/120/113046.pdf ................................................ *passim*

The Federalist No. 39 (J. Madison) .......................................................................27

## GLOSSARY

CERCLA                Comprehensive Environmental Response, Compensation,
                      and Liability Act

CSC                   Civil Service Commission

ERISA                 Employee Retirement Income Security Act

FEHBA                 Federal Employees Health Benefit Program

FIFRA                 Federal Insecticide, Fungicide, and Rodenticide Act

OPM                   Office of Personnel Management

## PRIOR OR RELATED APPEALS

There are no prior or related appeals.

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant Lee Ann Helfrich was injured in an automobile accident and recovered money in a settlement with the other driver's insurer. Before she settled, Ms. Helfrich received a demand from her health benefit plan, Defendants-Appellees Blue Cross and Blue Shield of Kansas City and Blue Cross Blue Shield Association (collectively "Blue Cross"), that she reimburse it for medical expenses out of any settlement monies she might recover. Ms. Helfrich filed a Petition for Declaratory Judgment in Kansas state court, alleging that the reimbursement claim was prohibited by Kansas regulation, Kan. Admin. Regs. § 40-1-20. JA18-JA24. The suit was removed to the United States District Court for the District of Kansas by Blue Cross. JA8-JA17. Blue Cross also counterclaimed, alleging that Ms. Helfrich breached the contractual obligations of her health plan, and sought a declaratory judgment that the Kansas regulation was preempted by a provision of the Federal Employee Health Benefits Act ("FEHBA"), 5 U.S.C. § 8902(m)(1). JA40-JA47. Blue Cross sought reimbursement in the amount of $76,561.88. JA191-JA192. Ms. Helfrich is a resident of Kansas; Blue Cross and Blue Shield of Kansas City is a citizen of Missouri; and Blue Cross Blue Shield Association is a citizen of Illinois. JA192. The district court had jurisdiction under 28 U.S.C. § 1332(a)(1). JA331.

On August 5, 2014, the district court granted Blue Cross's Motion for Judgment on the Pleadings. JA194-JA195. The order disposed of all claims of all parties. JA324-JA339. Ms. Helfrich filed a Notice of Appeal on September 2, 2014. JA341. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether FEHBA's preemption provision, 5 U.S.C. § 8902(m)(1), permits contract terms in federal health benefits contracts to preempt Kan. Admin. Regs. § 40-1-20.

## INTRODUCTION

This case turns on the meaning of an express preemption clause, 5 U.S.C. § 8902(m)(1), in the Federal Employee Health Benefits Act ("FEHBA"). The district court below construed this clause to have "broad scope" and "expansive sweep" such that it allows contractual reimbursement terms in health insurance plans to preempt state insurance laws regulating the availability of subrogation and reimbursement remedies for insurers. According to the district court, a natural reading of the § 8902(m)(1)'s terms reveals that Congress "intended for a contract containing terms of reimbursement to preempt state law."

But FEHBA's preemption clause is a limited, not expansive, preemption provision. When Congress passed § 8902(m)(1) in 1977, it said that the scope of preemption was "purposely limited" and intended only to prevent FEHBA carriers from complying with newly-passed state laws requiring insurers to cover substantive benefits like "chiropractice services" and acupuncture. It does not immunize federal carriers from the background state insurance laws that govern all insurance providers. That is why Congress emphasized that § 8902(m)(1) would not reach "state laws and regulations governing other aspects of the insurance business." S. Rep. No. 95-903, at 4 (1978).

The Supreme Court, too, has warned against an expansive interpretation of § 8902(m)(1)'s preemptive reach. In *Empire HealthChoice Assur., Inc. v.*

*McVeigh*, the Court found that FEHBA's preemption provision was an "unusual" and "puzzling measure," and open to more than one "plausible construction"—it could be read as either favoring or disfavoring preemption of state reimbursement laws. 547 U.S. 677, 697, 698 (2006). The Court therefore directed lower courts to adopt a "cautious interpretation," and a "modest reading" when deciding the preemptive scope of this provision. *Id.* at 697-98. It also rejected a reading of § 8902(m)(1) that would "leave[] no room for any state law potentially bearing on federal employee-benefit plans in general, or carrier-reimbursement claims in particular." *Id*. at 699. To the contrary, because insurance laws are traditionally a matter of state concern, they are presumed to escape preemption unless Congress makes "that atypical intention clear." *Id.* at 698. With § 8902(m)(1), Congress did not do so. *Id.*

Given this backdrop—a preemption clause that Congress said should be "purposely limited" and that the Supreme Court said is ambiguous and warrants cautious interpretation"—what should the district court have done when deciding between two plausible preemption interpretations, one in favor of preemption and one against? The only two appellate courts to decide this issue since *McVeigh* understood that this *mise en place*, coupled with longstanding canons of statutory interpretation, weighed in favor of reading the provision narrowly to avoid preempting state laws that Congress did not clearly say were preempted. *See Nevils*

*v. Grp. Health Plan, Inc.*, 418 S.W.3d 451 (Mo. 2014); *Kobold v. Aetna Life Ins. Co.*, 309 P.3d 924 (Ariz. Ct. App. 2013).

The district court here, by contrast, chose a different path. Instead of following the clues Congress and the Supreme Court have offered, the district court opted to start from scratch. It wiped the table clean, reinterpreting § 8902(m)(1) as though for the first time and without any reference to the relevant legislative history. Not only was that error—the district court has no authority to contradict what the Supreme Court and Congress have already said about this provision—but it fails to persuade even in its own right. It does violence to the longstanding canon of statutory construction requiring courts to adopt an interpretation disfavoring preemption when the statutory text is susceptible to two different interpretations; and it unjustifiably expands the reach of § 8902(m)(1) well beyond even common sense parameters.

It was also unnecessary. Reading § 8902(m)(1) narrowly—as Congress and the Supreme Court have counseled—does not leave the Office of Personnel Management (OPM), or its carriers, out to dry. As we explain below, there exist any number of solutions to OPM's concerns that FEHBA carriers will lose some ability to obtain reimbursement. None of these solutions threatens to overturn the well-established canons of statutory interpretation or narrow preemptive scope that Congress intended when it passed § 8902(m)(1). Nor do they pit § 8902(m)(1)

8

against the text of the Supremacy clause—an inevitable (albeit unnecessary) outcome of the district court's rule that reimbursement terms in a health insurance contract can preempt state laws. That conclusion, drawn as it is from an unjustifiably expansive interpretation of § 8902(m)(1), should be reversed.

## STATEMENT OF THE CASE

### A. Statutory Background

**1.** In 1959, Congress enacted FEHBA, 5 U.S.C. § 8901 *et seq.*, which established a program to administer health benefits to federal employees. OPM is responsible for administering the health benefits program and for regulating the health-benefits plans that cover federal workers. 5 U.S.C. § 8902(a), (e). The federal government does not itself serve as the insurance provider. Rather, OPM negotiates and contracts with private insurance companies to establish health insurance plans. *Id.* § 8902(a), (d). These private insurance companies, known under the FEHBA program as "carriers," 5 U.S.C. § 8901(7), agree to provide health insurance to federal employees in exchange for a fee according to the terms of a negotiated benefits contract. 48 C.F.R. § 1602.170-11.

Under FEHBA, OPM contracts to provide two different types of insurance plans with carriers: "community-rated" plans and "experience-rated" plans. 48

C.F.R. §§1602.170-2, 1602.170-7, 1602.170-11.[1] FEHBA treats these two carriers the same with respect to the funding source used to pay insurance benefits. Under both plans, the federal government pays a share of the insurance premium and plan enrollees pay the remaining balance. *See* 5 U.S.C. § 8906(b)(1), (b)(2), (f). These premiums are jointly deposited into a designated account with the U.S. Treasury known as the Employee Health Benefits Fund. 5 U.S.C. § 8909(a). Money from the Fund is then disbursed to the carriers, who use it to pay benefits claims and administrative costs. Both types of plans calculate premiums to cover carrier administrative costs, but "OPM does not ask for detailed administrative cost data." CRS, *FEHBP Report* at 19.

OPM does not require either experience-rated carriers or community-rated carriers to seek subrogation or reimbursement for employees. But, if a carrier chooses to include a right to subrogation or reimbursement in their benefits plan, OPM treats those recoveries differently depending on the carrier. Specifically, experience-rated carriers must credit back to the government all funds recovered after deducting the expenses of obtaining the recovery. 48 C.F.R. §§ 31.201-5,

---

[1] Experience-rated plan carriers include "[a]ll fee-for-service plans (and a small number of comprehensive plans)," whereas community-rated plan carriers "are basically the local HMOs." Annie L. Mach & Ada S. Cornell, Cong. Research Serv., *Federal Employees Health Benefits Program (FEHBP): Available Health Insurance Options*, 17-18 nn.50-51(2013), *available at* http://fas.org/sgp/crs/misc/RS21974.pdf (hereinafter CRS, *FEHBP Report*).

1631.201-70(a),(g),1652.216-71(b)(2). Funds are returned in one of two ways: "either as a cost reduction or by cash refund." 48 C.F.R. § 31.201-5. These regulations do not apply to community-rated carriers, however, which keep any recovered amounts. 48 C.F.R. § 1631.200.[2]

**2.** When Congress passed FEHBA it chose not to include any preemption provision, opting instead to embrace a system in which state laws co-existed with the federal law governing federal employee health benefits. That approach worked well: During FEHBA's early years, there were "few if any problems" between the two regimes. S. Rep. No. 95-903, at 7(1978) (Letter of Comptroller General).

In 1977, however, Congress amended the law to add an express preemption provision, 5 U.S.C. § 8902(m)(1). The clause provided:

> The provisions of any contract under [FEHBA] which relate to the nature or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health

---

[2] This system reflects an understanding that, because experience-rated carriers use an insurance model that minimizes risk, they should receive lower profits. Bryan Ford, *The Uncertain Case for Market Pricing of Health Insurance*, 74 B.U. L. Rev. 109, 121-22 (1994). Experience rating allowed insurers to pool groups of employees, thereby excluding groups like the elderly with larger expected medical costs, and to set rates based on a "group's claims experience for the prior period." *Id*. at 122 & nn.58-59. The federal government recognizes that "[e]xperience-rating in [FEHBA] is retrospective, with gains and losses carried forward in the next year's premium" and that this results in "little risk" for plans "because they make up for losses with premium increases the following year." CRS, *FEHBP Report* at 4, 17-18 & n.50. Community-rated plans do not adhere to this model and so carry higher risk. *Id*. at 18 & n.51.

> insurance or plans to the extent that such law or regulation is inconsistent with such contractual provisions.

5 U.S.C. § 8902(m)(1) (1996).

Congress added this provision to address the recent proliferation of state laws mandating health insurance coverage for certain kinds of benefits not typically covered by FEHBA carriers. *See* S. Rep. No. 95-903, at 3 (1978) (discussing, as one example, the increase in state requirements to cover "chiropractice services"); *see also* Miriam J. Laugesen et al., *A Comparative Analysis of Mandated Benefit Laws*, 1949-2002, 41 Health Services Research 1081, 1090 (2006) *available at* http://www.ncbi.nlm.nih.gov/pmc/ articles/PMC1713218/pdf/hesr041-1081.pdf (noting that, between 1949 and 1969, states passed only 19 laws mandating benefits, but that it increased to 169 by the mid-1970s).

Before Congress amended FEHBA, it commissioned a report from the Office of the Comptroller General to "identify[] those State health insurance requirements which conflict with contracts negotiated between the FEHB carriers and the Civil Service Commission [OPM's predecessor]." H.R. Rep. No. 95-282, at 2 (1978). This report diagnosed one major problem: States "required certain [FEHBA] carriers to provide benefits or services not covered in the contracts with [the federal government]." Report of the Comptroller General of the United States, B-164562, *Conflicts Between State Health Insurance Requirements and Contracts*

12

*of the Federal Employees Health Benefits Carriers* 3 (1975), *available at* http://www.gao.gov/assets/120/113046.pdf (hereinafter "Report of Comptroller General"); *see also* S. Rep. No. 95-903, at 7 (1978) (noting that "more and more States have legislated the kinds of benefits and medical practitioners that these carriers doing business in these states must cover."). The Comptroller pointed to several examples of these kinds of laws, including laws mandating coverage for services by persons licensed "to practice traditional oriental medicine, including acupuncture," Report of Comptroller General at 9, laws forcing federal carriers to recognize state "freestanding surgical facilities" as hospitals under FEHBA, *id.* at 10, and laws requiring coverage for treatment of "mental illness, alcoholism, and drug addiction." *Id.* at 11. It made no mention of state laws regulating subrogation or reimbursement.

The problem with these mandated benefit laws was that they placed federal carriers in a serious and difficult position—either "approve payment for a benefit not provided under [a FEHBA] contract but required by state law," or risk "loss of their license" in the state. S. Rep. No. 95-903, at 7 (1978) (Letter of Comptroller General). And so the Comptroller recommended that Congress add a preemption clause to FEHBA that would preempt state laws "insofar as they pertain to benefits and coverage." *Id.* at 7.

But, neither Congress nor the Comptroller wanted to upset the traditional understanding that FEHB carriers remained subject to background state insurance laws. *See* Report of Comptroller General at 15 (noting that the U.S. Civil Service Commission ("CSC") has taken the position that "the States have the authority to both regulate and tax health insurance carriers operating under [FEHBA]"). As the Comptroller's report explained, "[FEHBA] was not designed to regulate the insurance business or to override any State regulatory scheme." *Id*. And, consistent with this understanding, the Comptroller made clear that § 8902(m)(1) was a "form of limited preemption," that would not insulate FEHBA carriers from state regulations "pertaining to the regulation of insurance within the state." S. Rep. No. 95-903, at 7 (1978) (Letter of Comptroller General). By way of example, he noted that § 8902(m)(1) would not preempt FEHBA carriers from complying with laws involving the "payments of state premium taxes" or "state requirements for statutory reserves." *Id.*

Congress's understanding was no different. It stated that § 8902(m)(1) was "purposely limited." *Id*. at 4. The concerns warranting the inclusion of a preemption clause in FEHBA were narrow, and Congress went to some length to explain that the scope of FEHBA's preemption provision would not extend beyond those narrow concerns, and that it did not preempt traditional state insurance law. *Id*. (noting that the preemption provision is of "limited applicability" and offers a

14

"solution to the problem of maintaining uniformity of benefits to all enrollees"); *id.* ("Such a preemption, however, is purposely limited and will not provide insurance carriers under the program with exemptions from state laws and regulations governing other aspects of the insurance business, such as the payment of premium taxes and requirements for statutory reserves."); *see also* H.R. Rep. No. 95-282, at 4-5 (1978) ("The effect of this amendment is to preempt the application of State laws or regulations which specify types of medical care, providers of care, extent of benefits, coverage of family members, age limits for family members, or other matters relating to health benefits or coverage when such laws or regulations conflict with the provisions of contracts under [FEHBA].").

In 1998, Congress amended FEHBA's preemption provision to broaden its reach over benefits and coverage issues by merely deleting the phrase "to the extent that such law or regulation is inconsistent with the provisions of the Federal employees' health benefits contract." 5 U.S.C. § 8902(m)(1) (1997). In its current form, it now reads:

> The terms of any contract [under FEHBA] which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans.

5 U.S.C. § 8902(m)(1).

But, like before, Congress made clear that the scope of this preemption provision was limited. The major focus of the 1997 FEHBA amendments was not § 8902(m)(1); it was to "impose sanctions on" or to "bar" insurance providers, to "encourage full disclosure in discounted rate agreements," to "establish standards for readmitting discontinued health plans" and to credit financial reserves. Everything else—including the change to § 8902(m)(1)—was considered merely a "technical change[]." S. Rep. No. 105-257, at 1-2 (1998); *see also* H.R. Rep. No. 105-374, at 17 (1997) (making the same point).

Congress did not delete the limiting phrase "coverage or benefits," and the legislative history of the amendment demonstrates that Congress was still focused on preventing State laws addressing benefits and coverage issues that were surviving under the old provision. In Congress's view, the amendment's "changes would affect states that have requirements governing what types of organization can provide health care when those requirements are different from those under federal contracts." S. Rep. No. 105-257, at 15 (1998). But "the only effect of the preemption would be to limit the application of state law in some circumstances." *Id.*; *see also* H.R. Rep. No. 105-374, at 8 (1998) ("For example, a carrier's effort to establish a preferred provider organization (PPO) across the country would not be jeopardized by State-mandated 'any willing provider' statutes."); *id.* at 19 ("These

16

changes would affect states that have comparably higher requirements for types of medical coverage offered by health plans.").

**3.** Kansas regulation § 40-1-20 codifies "what has *always* been the common law in Kansas and elsewhere"—that personal injury insurance policies "are not indemnity contracts and therefore are not subrogated as are property or casualty insurance." Kan. Att'y Gen. Op. No. 84-35, at 1 (1984) (emphasis added). In 1967, Kansas, like a number of other states, promulgated a regulation designed to regulate the tort remedies that insurers have against insureds. Found within the provisions regulating all types of insurance within the State, Kan. Admin. Regs. § 40-1-20 provides that "[n]o health company or insurer may issue any contract . . . in Kansas containing a subrogation clause, or any other policy provision having a purpose or effect similar to that of a subrogation clause, applicable to coverages providing for reimbursement of medical, surgical, hospital, or funeral expenses."[3]

Kansas is one of eight states to adopt the common law prohibition against subrogation or reimbursement of tort recoveries.[4] Similarly, a number of states

---

[3] The regulation was promulgated by the Kansas Insurance Department, which regulates life insurance, fire and casualty insurance, accident and health insurance, credit insurance, and investments and deposits of securities within the state. *See* Kan. Stat. Ann. § 40-103; Kan. Admin. Regs. §§ 40-1-1 to 40-16-2. Kan. Admin. Regs. § 40-1-20 is found within Article I of the Department's regulations, which include general regulations applicable in all of these contexts.

[4] Four other states also prohibit subrogation by statute or regulation. Connecticut (Conn. Gen. Stat. Ann. § 52-225c); New York (N.Y. Gen. Oblig. Law

adopted the make-whole doctrine from the property insurance context and require

that a personal-injury victim be completely compensated before reimbursement or

subrogation may occur.[5]

---

§ 5-335); North Carolina (11 N.C. Admin. Code 12.0319); and Virginia (Va. Code Ann. § 38.2-3405). Another three do so on the basis of common law. Arizona (*Allstate Ins. Co. v. Druke*, 576 P.2d 489 (Ariz. 1978)); Missouri (*Travelers Indem. Co. v. Chumbley*, 394 S.W.2d 418, 424 (Mo. Ct. App. 1965)); New Jersey (*Perreira v. Rediger*, 778 A.2d 429, 431 (N.J. 2001)).

[5] Although one state has codified the make-whole doctrine, *see* Minn. Stat. Ann. § 62A.095 subd. 2(1), the majority of the states that apply the make-whole rule do so on the basis of common law. *Hare v. State*, 733 So. 2d 277, 284 (Miss. 1999); *Swanson v. Hartford Ins. Co.*, 46 P.3d 584, 589 (Mont. 2002); *Skauge v. Mountain States Tel. & Tel. Co.*, 565 P.2d 628, 632 (Mont. 1977); *Blue Cross & Blue Shield v. Dailey*, 687 N.W.2d 689, 698-99 (Neb. 2004); *York v. Sevier Cnty. Ambulance Auth., Inc.*, 8 S.W.3d 616, 621 (Tenn. 1999); *Ruckel v. Gassner*, 646 N.W.2d 11 (Wis. 2002). Two states only apply the common law doctrine if its application is expressly provided for in the insurance contract. *Stancil v. Erie Ins. Co.,* 740 A.2d 46, 49-50 (Md. Ct. Spec. App. 1999); *Julson v. Federated Mut. Ins. Co.,* 562 N.W.2d 117, 121 (S.D. 1997). And other states allow parties to contract out of the application of the common law rule. *See Ex parte State Farm Fire & Cas. Co.*, 764 So. 2d 543 (Ala. 2000); *Am. Contractors Indem. Co. v. Saladino*, 115 Cal. App. 4th 1262, 1271 (Cal. Ct. App. 2004); *Dist. No. 1 Pac. Coast Dist. v. Travelers Cas. & Sur. Co.*, 782 A.2d 269, 276 (D.C. 2001); *Roberts v. Richard*, 743 So. 2d 731, 734-35 (La. Ct. App. 1999); *Dimick v. Lewis*, 497 A.2d 1221, 1223 (N.H. 1985); *N. Buckeye Educ. Council Group Health Benefits Plan v. Lawson*, 798 N.E.2d 667, 673 (Ohio Ct. App. 2003); *Tomlinson v. Cont'l Cas. Co.*, 77 P.3d 628, 632 (Okla. Civ. App. 2003); *Ditomasso v. Ocean State Physicians Health Plan, Inc.*, No. 87-2467, 1988 WL 1016798, at *3 (R.I. Super. Ct. May 5, 1988); *Kanawha Valley Radiologists, Inc. v. One Valley Bank, N.A.*, 557 S.E.2d 277, 281 (W. Va. 2001).

## B. This Litigation

**1.** Early in the morning on December 30, 2012, in Shawnee, Kansas, Ms. Helfrich was struck by automobile and severely injured. JA20. After being transported by ambulance and admitted to the Overland Park Regional Medical Center, Ms. Helfrich was diagnosed with numerous leg and rib fractures, including breaks to the lower leg bones in both legs. JA20-JA21. Ms. Helfrich also suffered a fracture to her spine. JA20. Other ailments resulting from the accident included bruising of Ms. Helfrich's lungs and various lacerations to her face and scalp. JA21. Ms. Helfrich required surgery, which included the insertion of nails into her body to hold her leg bones together. *Id*. She remained in the hospital until January 4, 2013. *Id*. Ms. Helfrich's recovery kept her out of work for approximately six months. *Id*.

Ms. Helfrich required costly treatment for her injuries and her medical bills totaled $207, 955.64. JA22. As a federal employee working as an air traffic controller, Ms. Helfrich was entitled to medical coverage through a health insurance plan. JA18. Under the plan, Blue Cross paid a portion of the medical bills, $76,561.88, incurred by Ms. Helfrich as a result of the automobile accident. JA191.[6]

---

[6] This figure represents $74, 356.53 in benefits administered by Blue Cross and Blue Shield of Kansas City and $2,205.35 administered by Blue Cross and Blue Shield of Tennessee. JA191.

Ms. Helfrich asserted a claim against the driver who caused the accident. JA21. The tortfeasor had an automobile liability policy with a per person policy limit amount of $100,000.00, and Ms. Helfrich received this amount. *Id*.[7]

**2.** Shortly after Ms. Helfrich settled with the driver, Blue Cross's collection agency Meridian Resource Company, LLC ("Meridian") demanded she pay $74,356.53. JA22. Ms. Helfrich placed the entire $100,000 recovered under the tortfeasor's policy into a trust account. JA21.

Blue Cross contracted with OPM as an experience-rated carrier to administer a health benefits plan to federal employees (the "Plan"). JA88-JA125. Experience-rated status allows Blue Cross both to offer insurance only to certain groups of employees and to minimize the company's risk for loss. *See supra* p. 11 n.2. As relevant here, OPM's contract with Blue Cross includes a discretionary right to seek subrogation or reimbursement. JA117. The contract says that "the Carrier shall have the right to be subrogated," but that the Carrier "shall not be required to recover any amounts from any person or organization who causes an injury or illness for which the [insured] makes claims for benefits." *Id*. (emphasis added). The contract also makes clear that Blue Cross's "obligation . . . to recover amounts" is "limited to making a reasonable effort to seek recovery of amounts" in

---

[7] Kansas law sets minimum requirements for motor vehicle liability insurance coverage. Kan. Stat. Ann. § 40-3107. This statutory scheme requires coverage for bodily injury; and sets a floor of $25,000 per person liability coverage and $50,000 per accident. *Id*. at § 40-3107(e).

"cases which are brought to its attention." *Id*. With respect to reimbursement, the

contract allows that the "Carrier may also recover directly from the [beneficiary]

all amounts receive by the [insured] . . . from any third party or its insurer." *Id*.

The Plan also includes a Statement of Benefits. JA156-JA184.[8] According to

this document, Blue Cross has "rights of recovery and subrogation." JA167-JA168

(emphasis added). If Blue Cross "paid benefits" for an injury and a plan

beneficiary "receive[s] (or [is] entitled to)" any "recovery from another source" for

that injury, then the beneficiary must agree to certain provisions. JA167. Blue

Cross asserts a right of recovery to "all recoveries" obtained, even if the

beneficiary is "not made whole for all of [the] damages" and regardless of any

costs spent to obtain the recovery. *Id*. (noting the "right of recovery is not subject

to a reduction for attorney's fees and costs").

**3.** After Blue Cross demanded its full share of the medical expenses out of

the limited insurance settlement, Ms. Helfrich filed a Petition for Declaratory

Judgment in Kansas State Court and sought an order declaring that Kansas law

prohibits Blue Cross from requiring her to reimburse them for benefits paid under

the Plan. JA18-JA24. Kansas law provides that "[n]o insurance company or health

insurer . . . may issue any contract or certificate of insurance in Kansas containing

---

[8] The Plan provides that Blue Cross's "subrogation rights, procedures and
policies, including recovery rights, for payments with respect to benefits shall be in
accordance with the provisions of the agreed upon brochure text." JA104.

21

a subrogation clause, or any other policy provision having a purpose or effect similar to that of a subrogation clause, applicable to coverages providing for reimbursement of medical, surgical, hospital, or funeral expenses." Kan. Admin. Regs. § 40-1-20.

Blue Cross removed the case to federal court and counterclaimed, alleging that Ms. Helfrich breached her contractual obligations under the Plan and seeking an order that she was obligated to reimburse the Plan. JA8-JA17; JA37-JA47.[9] Blue Cross moved for judgment on the pleadings, arguing that Kansas' state law regulating reimbursement was preempted by § 8902(m)(1). JA194-JA195.

First, Blue Cross argued that § 8902(m)(1) expressly preempted Kansas law because the contract term at issue "relate[d] to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits)," and because § 40-1-20 "relate[s] to health insurance or plans." JA215-JA217. Second, Blue Cross argued the presumption against preemption did not apply to the Kansas law because the provision of federal health insurance benefits is not a traditional area of state regulation. JA227-JA232. Finally, the motion argued that FEHBA's preemption provision is constitutional. JA232-JA235.

---

[9] Initially, Blue Cross sought removal under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). JA9. On February 14, 2014, the parties filed a Joint Stipulation, which amended the amount in controversy and stipulated that the case was properly before the federal court pursuant to diversity jurisdiction, 28 U.S.C. § 1332(a)(1). JA191-JA192.

On August 5, 2014, the district court granted Blue Cross's motion. JA324-JA329. The district court first found that it "d[id] not have a duty to automatically accept any plausible reading [of the statute] that disfavors preemption." JA334. The court did not find that the area of regulation was traditionally federal, but it nonetheless determined that the presumption against preemption could "be overcome if the congressional purpose to preempt state law is clear." *Id*. In the court's view, a "natural reading of the statute," particularly the phrase "relate to," demonstrated that Congress intended § 8902(m)(1) to have a "broad pre-emptive purpose." JA324; JA335. Interpreting this clause, the district court concluded that Congress intended for contractual reimbursement terms that "have a connection with the extent of payments related to benefits" to exert preemptive effect. JA336.

The court reasoned that nothing in § 8902(m)(1) limits "payments" to "payments made by the insurance carrier," and so "'payments with respect to benefits' may be read to include payments owed by the insured back to the carrier in the form of reimbursement." JA336 (noting also that "because 'reimburse' means 'to repay,' the Court finds that the contractual terms of reimbursement certainly have a connection with the extent of payments related to benefits"). Buttressing this conclusion was the district court's belief that allowing the Kansas law to stand would frustrate the "uniform, nationwide interpretation of health

insurance plans for all federal employees so that issues such as reimbursement would . . . vary depending on which state the insured lives." JA338.

The district court therefore held that § 8902(m)(1) preempts Kansas law and declared Ms. Helfrich must reimburse Blue Cross $76,561.88. JA339. This appeal followed. JA341.

## SUMMARY OF ARGUMENT

The decision below is contrary to the longstanding canon of statutory interpretation that when the text of a preemption clause is susceptible to more than one plausible reading, courts "have a duty to accept the reading that disfavors preemption." *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449 (2005). In *McVeigh*, the Supreme Court considered FEHBA's express preemption provision, § 8902(m)(1), and found it to be a "puzzling measure," open to more than one "plausible construction." 547 U.S. at 697, 698. The district court acknowledged that the text of the statute was open to two competing interpretations, yet it opted to embrace the broad reading that favored preemption. That is improper statutory interpretation.

The district court's expansive reading also finds little textual support. The district court justified its broad reading of FEHBA's preemption clause by analogizing § 8902(m)(1)'s "relate to" language with the same phrase in ERISA's preemption clause. JA336. In the lower court's view, because "relates to" has been

interpreted to mean has "a connection with, or reference to" an employee benefit plan in ERISA, it must have "the same meaning in the FEHBA context." *Id*. But FEHBA and ERISA are not twins; their preemption clauses say different things and their statutory schemes and legislative history are radically different. Add to this that, even within ERISA, the phrase "relate to" does not mean what the district court said it means and the case for a broad reading collapses.

The district court likewise must be reversed because its uncabined and "expansive" interpretation of FEHBA's preemption provision has no grounding in the history or purpose of § 8902(m)(1). When Congress amended FEHBA to include a preemption clause, it made clear that its preemptive scope was "purposely limited." The preemption clause aimed to solve a narrow problem between FEHBA carriers and certain state laws that mandated coverage of, and payment for, substantive health benefits. But Congress explicitly recognized that, under FEHBA, federal carriers were still expected to comply with background rules of state insurance law. The district court understood the importance of FEHBA's purpose and history to the preemption question but, rather than embrace that history, it fled from it. In support of its broad theory of preemption it simply cited "the title of the law adding § 8902(m)(1) to the FEHBA." JA338 & n.60.

Finally, the rule adopted below—that private contractual terms can, under the Supremacy clause, preempt State *laws*—implicates serious constitutional

concerns. It squarely pits § 8902(m)(1) against the text of the Supremacy Clause, which provides that "*the Laws* of the United States . . . shall be the supreme Law of the Land," and, left to stand, would have far-reaching and unfortunate consequences for longstanding principles of Federalism. Conferring a "highly problematic, and probably unconstitutional" reading on FEHBA's preemption clause, *Empire HealthChoice Assur. Inc. v. McVeigh*, 396 F.3d 136, 147 (2d Cir. 2005), should have given the district pause. It did not, and that alone justifies reversing the decision below.

## STANDARD OF REVIEW

The standard of review for judgment on the pleadings under Fed. R. Civ. P. 12(c) is de novo. *Soc'y of Separationists v. Pleasant Grove City*, 416 F.3d 1239, 1240-41 (10th Cir. 2005) ("A decision by the district court granting a defense motion for judgment on the pleadings is reviewed de novo, using the same standard of review applicable to a Rule 12(b)(6) motion.").

## ARGUMENT

I.    **The District Court Erred by Failing to Apply the Presumption Against Preemption.**

   A. **The Presumption Against Preemption Requires that Courts Accept the Reading of a Preemption Provision that Disfavors Preemption.**

Our system of "dual sovereignty" between the federal government and the

States is "incontestable." *Printz v. United States*, 521 U.S. 898, 918 (1997).

Despite surrendering "many of their powers to the federal government," the States

nonetheless maintain "a residuary and inviolable sovereignty." *Id*. at 918-19

(quoting The Federalist No. 39, at 245 (J. Madison)). In keeping with these

federalism principles, "because the States are independent sovereigns in our federal

system, [courts] have long presumed that Congress does not cavalierly pre-empt

state law." *Bates*, 544 U.S. at 449; *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996)

(noting this "approach is consistent with . . . federalism concerns"). Accordingly,

before federal law will be found to trump state law, congressional intent to preempt

must be "clear and manifest." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230

(1947).

Federal laws that are ambiguous about their intent to preempt do not meet

this standard. "[W]hen the text of a pre-emption clause is susceptible to more than

one plausible reading, courts ordinarily accept the reading that disfavors

preemption." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Bates*, 544

U.S. at 449). In *Bates*, for example, the Supreme Court construed the preemptive

scope of an express preemption clause in the Federal Insecticide, Fungicide, and

Rodenticide Act (FIFRA). FIFRA's preemption provision stated that States "shall

not impose . . . any requirements for labeling or packaging in addition to or

different" from federal law. *Bates*, 544 U.S. at 442. This clause was potentially

open to two different interpretations: It could be read to prohibit only those state laws that were "in addition to or different from" federal requirements, but not those state laws that were "parallel" with federal law. *Id.* at 447. Alternatively, it could be read (as both Dow and the government did) to preempt all relevant state law, even those requirements that were consistent with federal law. *Id.*

The Court resolved FIFRA's potential ambiguity by adopting "the reading that disfavors pre-emption." *Id.* at 449. In reaching this result, the Court explained that, even if Dow's pro-preemption "alternative reading" was "just as plausible" as the no-preemption reading, it could not carry the day. *Id.* Under longstanding "canons of interpretation," including the presumption against preemption, courts "have a duty" to accept the no-preemption reading of an express preemption clause when confronted with two equally plausible interpretations. *Id.*; *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2189 (2014) (Kennedy, J., concurring) (explaining that the "effect of th[e] presumption is to support, where plausible, 'a narrow interpretation' of an express pre-emption provision").

Moreover, a court's duty to accept a narrow reading of an express preemption clause is particularly strong "when Congress has legislated in a field traditionally occupied by the States." *Altria Grp.*, 555 U.S. at 77; *see also Rice*, 331 U.S. at 230. For our purposes, both insurance law (the general area in which FEHBA regulates) and tort law (the nature of subrogation and reimbursement

remedies) fall comfortably within the arena of traditional state regulation. *See, e.g.*,
*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514
U.S. 645, 655 (1995) (insurance is a "field[] of traditional state regulation" to
which "presumption against pre-emption" applies); *U.S. Dep't of Treasury v. Fabe*,
508 U.S. 491, 507 (1993) ("[S]tate laws enacted 'for the purpose of regulating the
business of insurance' do not yield to conflicting federal statutes unless a federal
statute specifically requires otherwise."); *Metro. Life Ins. Co. v. Massachusetts*,
471 U.S. 724, 756 (1985) ("States traditionally have had great latitude under their
police powers to legislate as to the protection of lives, limbs, health, comfort, and
quiet of all persons."); *Wadsworth v. Allied Prof'ls Ins. Co.*, 748 F.3d 100, 105-06
(2d Cir. 2014) (noting the "general presumption" that "insurance regulation is
generally left to the states"); *see also CTS Corp.*, 134 S. Ct. at 2189 (Kennedy, J.,
concurring) ("In our federal system, there is no question States possess the
'traditional authority to provide tort remedies to their citizens' as they see fit.'");
*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255 (1984) (same).[10]

---

[10] The Supreme Court has identified certain arenas, by way of contrast, that
are "uniquely federal areas of regulation." *Chamber of Commerce v. Whiting*, 131
S. Ct. 1968, 1983 (2011). In these areas, the presumption against preemption
carries less weight. *Id.* Some examples of these federal areas of regulation include:
*Am. Ins. Ass'n. v. Garamendi,* 539 U.S. 396, 401, 405-06 (2003) (presidential
conduct of foreign policy); *United States v. Locke*, 529 U.S. 89, 108 (2000)
(maritime commerce); *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 373-
74 (2000) (foreign affairs power); *Buckman Co. v. Plaintiffs' Legal Comm.,* 531

This framework—applying the presumption against preemption where Congress has not spoken with clarity in an area of traditional state regulation—has been embraced by the Supreme Court through an unbroken line of cases for more than two decades. *CTS Corp.*, 134 S. Ct. at 2189 (Kennedy, J., concurring) (noting the "well-established presumptions about the nature of preemption"); *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 334 (2008); *Altria Grp.*, 555 U.S. at 77; *Bates*, 544 U.S. at 449; *Lorillard Tobacco Co. v. Reilly*, 553 U.S. 525, 54 (2001); *Medtronic*, 518 U.S. at 485; *Travelers*, 514 U.S. at 655; *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 668 (1993).

And this Court, too, has been no less clear that these principles apply when it comes to preemption. *See, e.g.*, *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1239 (10th Cir. 2011) (noting that "the presumption against preemption is especially strong in areas of longstanding state policy"); *Ramsey Winch Inc. v. Henry,* 555 F.3d 1199, 1204 (10th Cir. 2009) (holding that the presumption against preemption "applies with greater force when the alleged conflict is in an area traditionally occupied by the States"); *Integrity Mgmt. Int'l, Inc. v. Tombs & Sons, Inc.*, 836 F.2d 485, 491 (10th Cir. 1987) ("[a] surer basis" for holding Small Business Act did not preempt state common law remedies is the "presumption against preemption of traditional state law").

---

U.S. 341, 352 (2001) (fraud on a federal agency); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 143-44 (1989) (patent law).

**B. Section 8902(m)(1) Is a Classic Example of an Express Preemption Clause To Which the Presumption Should Apply.**

There is perhaps no clearer example of an express preemption clause to which the presumption against preemption should apply than § 8902(m)(1). As the Supreme Court has explained, the presumption applies most compellingly where a preemption clause is (1) "susceptible to more than one plausible reading," *Altria Grp.*, 555 U.S. at 77, and (2) "when Congress legislates in an area traditionally governed by the States' police powers." *CTS Corp.*, 134 S. Ct. at 2189 (Kennedy, J., concurring). FEHBA's preemption provision easily checks both these boxes.

Indeed, whether FEHBA's preemption provision is "susceptible to more than one plausible reading" is not an open question. In *McVeigh*, the Supreme Court looked at this provision and said the following: "Section 8902(m)(1) is a puzzling measure, open to more than one construction." 547 U.S. at 697. One could read the reimbursement clause in the contract "as a condition or limitation on 'benefits' received by a federal employee," making the clause a "'contract term[] relating to coverage or benefits' and 'payments with respect to benefits,' thus falling within § 8902(m)(1)'s compass." *Id.* (alterations omitted). "On the other hand," the Court explained, "§ 8902(m)(1)'s words may be read to refer to contract terms relating to the *beneficiary's* entitlement (or lack thereof) to Plan payment for certain health-care services he or she has received, and not to terms relating to the carrier's postpayments right to reimbursement." *Id.* The Court did not need to

choose between these two interpretations to decide the case, but it made clear that both constructions were "plausible." *Id.* at 698.

And the case for interpreting § 8902(m)(1) narrowly is even stronger when we consider that the area of regulation here—health insurance—is clearly an "area[] of traditional state regulation." *Bates*, 544 U.S. at 449. "The control of all types of insurance companies and contracts has been primarily a state function since the States came into being." *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 372 (1955); *see also Metro. Life Ins. Co.*, 471 U.S. at 756 (noting that "statutes regulating the substantive terms of insurance contracts have become commonplace in all 50 states over the last 30 years").

It is, therefore, precisely because, "[w]hen the States speak in the field of 'insurance,' they speak with authority of a long tradition," that courts "start with a reluctance to disturb the state regulatory schemes that are in actual effect, either by displacing them or by superimposing federal requirements on transactions that are tailored to meet state requirements." *Sec. & Exch. Comm'n v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 68-69 (1959); *see also Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 387 (2002) (explaining that the regulation of insurance is "a subject of traditional state regulation," and so there could be no "preemption without clear manifestation of congressional purpose"); *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 191 (4th Cir. 2007) ("States continue to

enjoy wide latitude to regulate healthcare providers.") (emphasis omitted); *Zahl v. Harper*, 282 F.3d 204, 211 (3d Cir. 2002) ("Regulating matters of health is among the historic police powers of a state."); *Grider v. Abramson*, 180 F.3d 739, 747 n.9 (6th Cir. 1999) ("[T]he broad 'police power' of the states and their local subdivisions includes the authority and duty to regulate community health and safety.").

The traditional state nature of regulation also holds true for the specific subrogation and reimbursement remedies as well. The two doctrines are firmly rooted in both tort and insurance law. *See Great Am. Ins. Co. v. United States,* 575 F.2d 1031, 1034 (2d Cir.1978) (Subrogation "is an exclusively derivative remedy which depends upon the claim of the insured and is subject to whatever defenses the tortfeasor has against the insured."); *Standard Accident Ins. Co. v. Pellecchia*, 104 A.2d 288, 292 (N.J. 1954) (explaining that one of subrogation's goals is to protect against the possibility that the "insured would be unjustly enriched by virtue of a recovery from both the insurer and the [tortfeasor]"); *see also* Kenneth S. Abraham & Kyle D. Logue, *The Genie and the Bottle: Collateral Sources Under the September 11th Victim Compensation Fund*, 53 DePaul L. Rev. 591, 617 (2003) ("collateral nonoffsets, together with the subrogation principle, are essential to tort law's deterrence function of shifting the costs of accidents from victims to injurers"); Jeffrey A. Greenblatt, Comment, *Insurance and Subrogation:*

*When the Pie Isn't Big Enough, Who Eats Last?*, 64 U. Chi. L. Rev. 1337, 1341

(1997) (arguing that subrogation "places the burden of compensation on the

tortfeasor and thus deters injurious behavior"); Elaine M. Rinaldi, *Apportionment*

*of Recovery Between Insured and Insurer in a Subrogation Case*, 29 Tort & Ins.

L.J. 803, 803 (1994) ("The doctrine of subrogation enables an insurer that has paid

an insured's loss pursuant to a policy of property insurance to recoup the payment

from the party responsible for the loss.").

And these two doctrines are as old as the law itself, anchored in the local

common law of Roman, Talmudic, French, and more recently, British legal

regimes. *See* Brendan S. Maher & Radha A. Pathak, *Understanding and*

*Problematizing Contractual Tort Subrogation*, 40 Loy. U. Chi. L.J. 49, 59 (2008)

("[S]ubrogation originated in equity, and the doctrine's history is largely one of

common law."); Jeffrey A. Greenblatt, Comment, *Insurance and Subrogation:*

*When the Pie Isn't Big Enough, Who Eats Last?*, 64 U. Chi. L. Rev. 1337, 1339

n.10 (1997) ("The origin [of subrogation is likely] in Talmudic Law, where a

surety who discharges the debt of a debtor may proceed directly against the debtor.

. . ."); M.L. Marasinghe, *An Historical Introduction to the Doctrine of*

*Subrogation: The Early History of the Doctrine I*, 10 Val. U. L. Rev. 45, 50-

51(1975) (describing the Roman doctrine of cessio actionum, and identifying it as

the precursor of subrogation in England); M.L. Marasinghe, *An Historical*

34

*Introduction to the Doctrine of Subrogation: The Early History of the Doctrine II*,

10 Val. U. L. Rev. 275, 284-88 (1976) (describing the French influence on the

development of subrogation in England).

On this point, *McVeigh* only reinforces how local reimbursement and

subrogation claims really are. Blue Cross's "contract-derived claim for

reimbursement," the Court declared, "is not a creature of federal law." *McVeigh*,

547 U.S. at 696. Instead, "claims of this genre, seeking recovery from the proceeds

of state-court litigation, are the sort ordinarily resolved in state courts." *Id.* at 683.

That is because a right to reimbursement "stems from a personal-injury recovery,

and the claim underlying that recovery is plainly governed by state law." *Id*. at 698.

The same is true of subrogation. That right "allows the carrier, once it has paid an

insured's medical expenses, to recover directly from a third party responsible for

the insured's injury or illness." *Id.*at 698-99. But, had Blue Cross "taken that

course," the carrier's recovery would likewise "be governed . . . by state law." *Id.*at

699.

For a court facing this preemption question in the wake of *McVeigh*, then,

the existence of two "plausible" interpretations of this preemption clause—arising

in an area of traditional state regulation—should lead to a straightforward

acceptance of the reading that disfavors preemption. *Bates*, 544 U.S. at 449

(holding that where the text of a preemption clause is open to more than one

plausible reading, particularly in an area of state regulation, courts "have a duty to accept the reading that disfavors pre-emption"); *see also Murphy v. Dulay*, 768 F.3d 1360, 1367-68 (11th Cir. 2014) ("If the terms of the federal statute can be read sensibly not to preempt state law, the presumption controls."). In fact, that is exactly what the Missouri Supreme Court did in *Nevils*. Considering *McVeigh*'s recognition "that the FEHBA preemption clause is susceptible to reasonable, alternate interpretations," the court followed *Bates*'s lesson that, "when two plausible readings of a statute are possible, we would nevertheless have a duty to accept the reading that dis-favors preemption.'" *Nevils*, 418 S.W.3d at 454 (quoting *Bates*, 544 U.S. at 449); *see also Kobold*, 309 P.3d at 927 (applying the same canon to § 8902(m)(1) and accepting the "reading that disfavors pre-emption").

The conclusion that § 8902(m)(1) should be read narrowly, to avoid preempting traditional state law rules, fits even more snugly when we consider what the Court in *McVeigh actually said* about the scope of FEHBA's preemption clause. Given the distinctly state-law nature of subrogation and reimbursement rights, the Court rejected a reading of § 8902(m)(1) that would "leave[] no room for any state law potentially bearing on federal employee-benefit plans in general, or carrier-reimbursement claims in particular." *McVeigh*, 547 U.S. at 699. And, not to put too fine a point on it, but the Court also effectively set the stage for the

presumption against preemption to apply: "If Congress intends a preemption

instruction completely to displace ordinarily applicable state law," the Court

explained, 'it may be expected to make that atypical intention clear." *Id.* at 698.

But when it comes to § 8902(m)(1), Congress did "not do[] so here." *Id.*

 The lesson from *McVeigh* is hard to escape: § 8902(m)(1) does not speak

clearly enough to justify an expansive preemption reading such that traditional

state law rules governing reimbursement and subrogation are displaced. But, if

there was even a doubt about any of this, the presumption applies for another

reason as well. By its terms, § 8902(m)(1) "renders preemptive contract terms in

health insurance plans, not provisions enacted by Congress." *McVeigh*, 547 U.S. at

697. "A prescription of that unusual order," the Court warned in *McVeigh*,

"warrants cautious interpretation." *Id.* How much clearer could the Court have

been that § 8902(m)(1) should not be read expansively to reach typical state

insurance laws that regulate subrogation and reimbursement? As if it needed

repeating, two paragraphs later the Court said, yet again, that because

"§ 8902(m)(1) declares no federal law preemptive, but instead, terms of an OPM-

[Blue Cross] negotiated contract, a modest reading of the provision is in order." *Id.*

at 698.

       \* \* \* \*

Taken together, the case for applying the presumption against preemption to this provision is about as clear as can be: The Supreme Court itself has said the provision can be plausibly interpreted two different ways; the area of regulation at issue here is traditionally a state domain, and the "unusual" nature of § 8902(m)(1)'s preemption prescription warrants "a modest reading" and "cautious interpretation." But the district court here rejected these factors, opting instead to embrace the most *expansive* reading of FEHBA's preemption provision. As we explain below, that was wrong.

## II.     The District Court Was Wrong to Read § 8902(m)(1) Expansively.

### A. The District Court Disregarded *McVeigh*.

In this case, the district court recognized that, in *McVeigh*, the Supreme Court determined that § 8902(m)(1) was susceptible to "two 'plausible constructions,'" one for and one against preemption. JA331. It also agreed that the area of regulation—insurance—was a traditional area of state regulation. *Id*. And, it acknowledged that the only two appellate courts to look at this issue since *McVeigh* had—based on *McVeigh*—applied the presumption against preemption to read § 8902(m)(1) narrowly. JA332-JA333 (discussing *Nevils* and *Kobold*). Yet the district court here rejected that approach, refused to apply the presumption against preemption, and held that the text of § 8902(m)(1) was "clear" in broadly

preempting state law, including the laws regulating subrogation and reimbursement. JA338. That was error.

*McVeigh* does not mince words: The text of § 8902(m)(1) is "open to more than one [plausible] construction," "warrants cautious interpretation," requires a "modest reading," and involves a distinctly state area of regulation. 547 U.S. at 697, 698. Under "well established 'presumptions about the nature of pre-emption,'" *CTS Corp.*, 134 S. Ct. at 2189 (Kennedy, J., concurring), the district court was required—indeed, had a "duty"—to "accept the reading that disfavors pre-emption." *Bates*, 544 U.S. at 449.

What led the lower court astray? It believed that, even though the Supreme Court had already said § 8902(m)(1) was ambiguous, it was free to undertake an independent analysis of "the statutory text" to "discern" whether it was unambiguous. JA334 (asserting that it did "not have a duty to automatically accept any plausible reading that disfavors preemption"). Not so. Once the Supreme Court determines that the text of a statute is ambiguous, lower courts are not free to override that conclusion. Instead, they are duty-bound to faithfully apply the "canons of interpretation" that necessarily follow from a conclusion that statutory text is ambiguous. *Gottlieb v. Carnival Corp.*, 436 F.3d 335 (2nd Cir. 2006) ("If a statute is ambiguous, we resort to the canons of statutory construction to help resolve the ambiguity."); *In re Baker*, 430 F.3d 858, 860 (7th Cir. 2005) ("[A]court

resorts to canons of statutory construction" when "the court cannot find an answer in the plain meaning of statutory language."). In this case, not only did the Supreme Court say that the text of § 8902(m)(1) is open to multiple plausible interpretations, but it also *explicitly* directed future courts to apply a "modest reading" when interpreting the provision and *explicitly* said the clause required "cautious interpretation." *McVeigh*, 547 U.S. at 697, 698. The lower court was not free to ignore these prescriptions.

Even the district court's own proffered authority for its decision to reinterpret the ambiguity of § 8902(m)(1)—*CTS Corp.*—cuts the legs out from underneath its approach. That case, according to the district court, proved that the presumption against preemption was optional, since the Supreme Court only relied on it for "additional support," after *first* interpreting the plain meaning of the text to determine whether the preemption clause should read broadly or narrowly. JA334-JA335. Following what it saw as *CTS Corp.*'s lead, the district court believed it could "resolve" the scope of preemption first "through a natural reading of the FEHBA to ascertain whether there is clear congressional intent to preempt state law." JA335. This was also wrong.

In *CTS Corp.*, the Court had *not* previously considered whether the "natural reading" of CERCLA's preemption provision was susceptible to more than one plausible reading, so it was free to consider that question for the first time. 134 S.

40

Ct. at 2180. Below, the Fourth Circuit panel majority had found the text of the

provision to be "ambiguous"—it thought the text could be read to preempt both

state statutes of limitations and statutes of repose, or only state statutes of

limitations—but the panel majority nonetheless adopted the "interpretation in favor

of pre-emption." *Id*. at 2181-82. The Supreme Court reversed on both counts,

determining that the preemption clause was not ambiguous, and that, even if it

were, the presumption against preemption should have compelled an interpretation

disfavoring preemption. *Id*. at 2187; *see also id*. at 2188 (Kennedy, J., concurring).

Nothing about that result justifies the district court's choice to disregard

*McVeigh*'s lessons about § 8902(m)(1). Unlike in *CTS Corp.*, the ambiguity of

§ 8902(m)(1) has already been established and the Court has told us that the clause

must be read modestly and with caution. Given that fact, the relevant lesson of *CTS*

*Corp.* is precisely the opposite of the one the district court drew: "when the text of

a pre-emption clause is susceptible of more than one plausible reading, courts

ordinarily 'accept the reading that disfavors pre-emption'"—which means adopting

a "narrow interpretation" of an express preemption provision. *Id.* at 2188

(Kennedy, J., concurring); *see also Arizona v. Inter Tribal Council of Arizona, Inc.*,

——U.S.——, 133 S.Ct. 2247, 2261 (2013) (Kennedy, J., concurring) (describing the

presumption against preemption as a "cautionary principle" designed to "ensure

that pre-emption does not go beyond the strict requirements of the statutory

command").

### B. Section 8902(m)(1)'s "Relate To" Language is Neither Broad Nor Expansive.

Even on its own terms, though, the district court's expansive interpretation

of § 8902(m)(1) doesn't hold water. Having brushed *McVeigh* aside, the district

court justified its broad reading of FEHBA's preemption clause by analogizing

§ 8902(m)(1)'s "relate to" language with the same phrase in ERISA's preemption

clause. JA335-336. In the lower court's view, because "relates to" has been

interpreted to mean has "a connection with or reference to" an employee benefit

plan in ERISA, it must have "the same meaning in the FEHBA context." JA336.

Under this expansive reading, because "the contractual terms of reimbursement"

have "a connection with the extent of payments related to benefits," a "natural

reading of the statutory language reveals that Congress intended for a contract

containing terms of reimbursement to preempt state law." JA336-JA337. This

reasoning fails at every turn.

*First*, the Court in *McVeigh* has already rejected the idea that the term

"relate to" in § 8902(m)(1) was intended to have "broad scope" and an "expansive

sweep." 547 U.S. at 697-98. Instead, as we explained earlier (at *supra* p. 37), the

Court made clear that § 8902(m)(1) "leaves[] room" both for "state law[s]

potentially bearing on federal employee-benefit plans in general," and "carrier-

reimbursement claims in particular." *McVeigh*, 547 U.S. at 699; *Id.* at 697-98.

Under the district court's interpretation, that room is gone; no state laws that bear

on reimbursement claims can survive § 8902(m)(1)'s sweep because (again,

according to the district court) "by definition, reimbursement relates to the extent

of payment of benefits as required by § 8902(m)(1)." JA337. That conclusion quite

simply cannot stand alongside *McVeigh. See also Silkwood*, 464 U.S. at 255-56

(explaining that, where "Congress assumed that traditional principles of state tort

law would apply," then it also intended "to tolerate whatever tension there was

between them" and federal law).[11]

  *Second*, ERISA's preemption provision is not like FEHBA's. ERISA's

clause preempts state laws that "relate to any employee benefit *plan*," 29 U.S.C.

§ 1144(a) (emphasis added), whereas FEHBA grants preemptive power only to

contract terms that "relate to the nature, provision, or extent of *coverage or*

*benefits*." § 8902(m)(1). The latter limits the preemptive effect to a narrower subset

---

[11]In reaching its preferred preemption interpretation, the district court reasoned that, because "the statutory language does not limit 'payments' to payments made by the insurance carrier," "payments with respect to benefits" may be "read to include payments owed by the insured back to the carrier in the form of reimbursement." JA336. And because the court determined that "'reimburse' means 'to repay,' . . . the contractual terms of reimbursement certainly have a connection with the extent of payments related to benefits." *Id*. But to state this logic, unadorned as it is by any authority, only illustrates the arbitrariness of the district court's chosen interpretation. In other words, this view is certainly plausible—as the Court in *McVeigh* itself understood—but it is by no means a compelling or necessary interpretation. *See* 547 U.S. at 697 (comparing the two possible interpretations).

of matters than the former. *See McVeigh*, 547 U.S. at 698 (comparing the two preemption clauses and observing that, unlike § 1144(a) in ERISA, § 8902(m)(1) "does not purport to render inoperative *any and all* state laws that in some way bear on federal employee-benefit plans"); *see also Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990) ("under the plain language of [ERISA] the Court has held that only state laws that relate to benefit *plans* are pre-empted").

Moreover, ERISA is significantly more comprehensive than FEHBA. It contains "multiple preemption provisions and a detailed civil enforcement scheme intended to completely supplant state law." *McVeigh*, 396 F.3d at 147 (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987). When the Supreme Court has broadly construed ERISA's preemptive reach (and, as we explain below, that has not always or even recently been the case), it has "relied heavily on ERISA's civil enforcement provisions, as well as those provisions' unambiguous legislative history . . . . 'fully confirming' that ERISA's remedies were meant to be exclusive." *McVeigh*, 396 F. 3d at 148 (citing *Aetna Health Inc. v. Davila*, 542 U.S. 200, 217 (2004); *Pilot Life* 481 U.S. at 55; *Ingersoll-Rand* 498 U.S. at 138). FEHBA has no comparatively comprehensive structure, so the analogy falls flat.

Indeed, the structural differences between ERISA and FEHBA are particularly important when construing the phrase "relate to." As courts across the country have repeatedly explained, the precise meaning of the vague term "relates

44

to" depends on the larger statutory context. *Roach v. Mail Handlers Ben. Plan*, 298 F.3d 847, 850 (9th Cir. 2002) ("'relates to' must be read in the context of the" presumption against preemption); *Legal Envtl. Assistance Found., Inc. v. U.S. E.P.A.*, 276 F.3d 1253, 1258, 1259 (11th Cir. 2001) ("'relates to' injects ambiguity and interpretative breadth" into statutory provision and courts must "look to the particular statutory language at issue, as well as the language and design of the statute as a whole"); *Fort Wayne Cmty. Schs. v. Fort Wayne Educ. Ass'n, Inc.*, 977 F.2d 358, 366 (7th Cir. 1992) ("interpretation of the statute is necessary to fulfill the legislative deign" when "the statutory text is ambiguous because it leaves undefined to terms 'relate' and 'current business'"). The history and legislative scheme of ERISA stands in stark contrast to that of FEHBA, and so must the meaning of the phrase "relate to."

*Third*, the district court was also wrong about how the "relate to" phrase has been construed in ERISA. True, at one point in time, the Supreme Court said that, for ERISA, "relate to" should have a "broad common-sense meaning" such that "a state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect." *Ingersoll-Rand*, 498 U.S. at 139. And this is what the district court relied on when it construed FEHBA. JA336 & n.47 (citing *Ingersoll-Rand*).

But the Supreme Court later dramatically walked back this expansive construction in *Travelers*. There, the Court made clear that, even in ERISA, the existence of the phrase "relate to" could not overcome the "assumption that the historic police powers of the States were not to be superseded by the Federal Act," especially where "federal law is said to bar state action in fields of traditional state regulation." 514 U.S. at 654-55 (refusing to allow "relate to" to "read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality").

Turning to the "words of limitation"—"relate to"—in ERISA's preemption provision, the Court in *Travelers* was skeptical that they could "do much limiting." *Id.* at 655. It refused to accept either definitions of this term—"connection with" or "reference to"—as helpful in construing the scope of preemption. And it *rejected* its "prior attempt" at "drawing the line" over what laws this term could reach. *Id.* Ultimately, the Court made clear that the "relate to" language was simply "unhelpful text" that only complicated things. *Id.* at 656 (concluding that "[w]e simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive").

Since *Travelers*, most courts now confronting ERISA preemption have understood the Court *not* to have settled on the expansive definition first supplied

46

in *Ingersoll-Rand*, and which the district court adopted here. *Liberty Mut. Ins. Co. v. Donegan*, 746 F.3d 497, 506 (2d Cir. 2014) ("The Supreme Court's 1995 decision in [*Travelers*] marked something of a pivot in ERISA preemption" because "the Court pulled back on its broad, literal reading of 'relate to.'"); *Trustees of AFTRA Health Fund v. Biondi*, 303 F.3d 765, 773 (7th Cir. 2002) (noting that "[t]he Supreme Court's early ERISA preemption cases glossed over the 'relate to text' of [ERISA's preemption clause] by portraying the phrase as deliberately expansive," but "[i]n recent years, however, the Court has taken a more restrictive view" and citing to *Travelers* for when "[t]he tide began to turn"); *Carpenters Local Union No. 26 v. U.S. Fidelity Guar. Co.*, 215 F.3d 136, 140 (1st Cir. 2000) ("*Travelers* plainly signaled a significant analytic shift" in the ERISA preemption inquiry, "abandoning strict textualism in favor of a more nuanced approach"); *Morstein v. Nat. Ins. Svcs., Inc.*, 93 F.3d 715, 721 (11th Cir. 1996) (characterizing *Travelers* as "essentially turn[ing] the tide on the expansion of the preemption doctrine").[12]

---

[12] In point of fact, it is typically only where Congress has sought to *de*-regulate a particular industry that the Supreme Court has been inclined to give expansive sweep to the term "relate to." *See Rowe v. N.H. Motor Trans. Ass'n*, 552 U.S. 364 (2008) (holding that the Federal Aviation Administration Authorization Act, a statute passed by Congress to deregulate the trucking industry, preempted state laws governing the delivery of tobacco); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) (holding that the Airline Deregulation Act expressly preempted state airline guidelines because Congress enacted the law "to ensure that the States would not undo federal deregulation with regulation of their own"); *see*

*Finally*, the district court buttressed its preferred preemption interpretation by rejecting a limiting principle that would have cabined § 8902(m)(1)'s preemptive reach to only those state laws that have "a direct and immediate relationship" to insurance coverage or benefits. JA336, JA337. Under that reading, the court admitted, a carrier's reimbursement right would likely not preempt a state subrogation or reimbursement regulation because it bears "no immediate relationship" to coverage or benefits. JA337. But, it believed that merely "an indirect effect is enough to show a relationship for preemption purposes." *Id.*

That view does not square with the Supreme Court's case law in ERISA, let alone anything in FEHBA. In *Travelers*, the Court made clear that ERISA's preemption provision could not operate to preempt "all regulations that would influence the cost of insurance." 514 U.S. at 663. If, for example, "a State were to regulate sales of insurance by commercial insurers more stringently than sales by insurers not for profit, the relative cost of commercial insurance would rise; we would nonetheless say . . . that such laws do not 'relate to' benefit plans in the first instance." *Id.* at 663-64. So too for laws permitting a "basic tax exemption enjoyed by nonprofit insurers." *Id.* at 664. The Court explicitly rejected a theory of

also *Am. Airlines v. Wolens*, 513 U.S. 219, 224 (1995) (same, noting that certain state airline requirements were "inconsistent with the ADA's deregulatory purpose"). But even in that context, the Court has still recognized that federal law might not preempt those state laws that impact federal efforts to deregulate in only a "tenuous, remote, or peripheral . . . manner." *Morales*, 504 U.S. at 390.

preemption that would sweep these laws away because they "affect[] insurance prices and plan costs." *Id.*

Indeed, the district court's view contains no limiting principle whatsoever—virtually every law can, in some way, be shown to have an incidental economic effect on a regulated actor—and so courts have repeatedly rejected that kind of rationale to justify preemption. *See, e.g.*, *Travelers*, 514 U.S. at 659-60 (the "indirect economic influence" of state surcharges to commercial insurers did not "function as a regulation of an ERISA plan itself" or "preclude uniform administrative practice or the provision of a uniform interstate benefit package"); *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 88 (1994) (state rules that "might deplete the deposit insurance fund" were not preempted because "the forgoing of *any* money," by the fund and "more money arguments" did not justify the creation of a federal rule of decision); *U.S. v. Yazell*, 382 U.S. 341, 348-50 (1966) (some federal financial interest "to collect moneys which the Government lends," in "an individualized, negotiated contract" is not enough to displace "state law to the contrary" and provide the federal government with "a preferred right which is not provided by statute or specific agency regulation"); *see also New England Health Care Emps. Union v. Mount Sinai Hosp.*, 65 F.3d 1024, 1030-33 (2d Cir. 1995)

(state laws having only an "indirect economic effect on ERISA plans" do not share "connection with" or "reference to" ERISA plan to "trigger ERISA preemption").[13]

Ultimately, if the federal government actually needed the money recovered by carriers through reimbursement and subrogation, it could take any number of different steps that—even to this day—it has not pursued. Any of them could cure the underlying concern without doing violence to longstanding canons of statutory interpretation or preexisting understandings of the meaning of § 8902(m)(1). To offer just a few:

**1. OPM could adopt a regulation addressing carrier reimbursement and subrogation rights.** Although OPM has taken the position in *amicus* briefs and opinion letters that carrier reimbursement recoveries are "credited to the FEHB fund" and "thus translate to direct savings for the federal government and FEHB enrollees," it has yet to *ever* propose a rule that would address these rights. Br. of U.S. as Amicus Curiae at 4, *Nevils*, 451 S.W.3d 451 (Mo. 2014), (No. ED98538). (noting only that FEHBA "program contracts generally provide for a right of subrogation"); *see also* 5 U.S.C. § 8913(a) (giving OPM authority to "prescribe regulations necessary to carry out" FEHBA). Faced with a desire to recover reimbursement dollars, other agencies have followed exactly this approach. *See,*

---

[13] As if to hammer this point home, the district court recognized that, in theory, "there must be some limit to how far "relate to" should be construed," but it could come up with no example of where that boundary could be drawn under its own expansive interpretation. JA337-JA338.

*e.g.*, 20 C.F.R. §§ 10.705-10.719 (Department of Labor regulations implementing third party liability provisions of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 933); 42 C.F.R. §§ 433.135 *et seq.* (Department of Health and Human Services regulations implementing third party liability provisions of Medicaid, 42 U.S.C. § 1396a). And, were OPM to follow suit, its rule—unlike its current informal position—would be entitled to a higher degree of deference. *E.g.*, *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).

**2. OPM could *actually require* carriers to pursue subrogation or reimbursement.** As it currently stands, OPM does not require its carriers to pursue reimbursement. JA117. *See also* Br. for Resp. in Opp. to Pet. for Cert. at 17-19, *Nevils* (No. 13-1305) (in case considering whether § 8902(m)(1) preempted Missouri law, FEHBA contract did not contain a contractual reimbursement clause). If it actually required carriers to seek reimbursement—a la Medicaid, 42 U.S.C. § 1396a—then it likely could increase the return of reimbursement dollars coming back to the FEHB Fund.[14]

---

[14] If anything, the fact that OPM does not even require reimbursement or subrogation from Blue Cross, "[t]he largest plan in the FEHBA program," Br. of U.S. as Amicus Curiae at 4, *McVeigh*, 547 U.S. 477 (2006) (No. 05-200), certainly cuts against the idea that recovered monies are of vital importance to the government coffers.

**3. OPM could ask Congress, yet again, to amend § 8902(m)(1).** The history of § 8902(m)(1) is, in many ways, the history of Congressional responsiveness to OPM. The provision was initially enacted because the Civil Service Commission (OPM's predecessor) believed that the provision offered the "only permanent statutory solution" to the "serious problem[]" of plan carriers being compelled to pay extra-contractual benefits in some of the states. S. Rep. No. 95-903, at 4, 7 (1978). And, when § 8902(m)(1) was amended in 1998, the legislative change was "based upon concerns raised" to Congress and a review conducted by OPM. S. Rep. No. 105-257, at 2-3 (1998).

There is nothing preventing OPM from requesting another amendment to FEHBA. Congress has shown a clear responsiveness to OPM's concerns, particularly where "maintenance of the fiscal integrity of the program" serves as the basis for amendment. H.R. Rep. No. 100-917 (1988) (amending FEHBA to address "types of financial misconduct" by providers to "strengthen the ability of OPM to restrict the incidence of fraud" and incur "savings[] from the stricter monitoring of providers and greater protections against fraud"). And Congress has also specifically amended federal laws to provide for subrogation. For instance, Medicare was amended after "many years [when] courts were divided about the propriety of the federal government's attempts to recover Medicare expenditures . . .in cases involving tort settlement claims." *In re Zyprexa Prods. Liab. Litig.*, 451

52

F.Supp. 2d 458, 465 (E.D.N.Y. 2006) (citing cases); *see also* H.R. Rep. No. 108-178(II), at 189 (2003) (explaining that the "Secretary's authority to recover payment from any and all responsible entities" under the MSP "would be clarified" as a result of the amendments); *id.* at 189-90 (stating that one reason for the amendments was to remedy the effects of "recent court decisions" that would allow "firms that self-insure for product liability" to be "able to avoid paying Medicare for past medical payments related to the claim").

### C. The Congressional Purpose Behind § 8902(m)(1) Convincingly Demonstrates that Congress Did Not Intend to Create a Broad Preemption Provision.

The district court thought that the congressional purpose behind the passage of § 8902(m)(1) added "support for finding in favor of preemption." JA388. Citing only the "title of the law adding § 8902(m)(1) to the FEHBA"—and not the actual legislative history—the court erroneously concluded that the "aim of the statute was to provide for a uniform, nationwide interpretation of health insurance plans for all federal employees so that issues such as reimbursement would not vary depending on which state the insured lives." *Id.* & n.60. That conclusion is wrong.

To begin, consider the actual legislative history behind Congress's passage of § 8902(m)(1). *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 106 (2007) (Stevens, J., concurring) ("Analysis of legislative history is, of course, a traditional tool of statutory construction" that can make the purpose of a statute

"pellucidly clear."); *AD Global Fund, LLC v. United States*, 67 Fed. Cl. 657, 676-77 (2005) ("The most persuasive sort of legislative history are the reports from the committees that studied, drafted, and proposed the legislation."). When Congress passed H.R. 2931 (the bill containing the original version of § 8902(m)(1)), the Senate Report made clear that preemption provision was "purposely limited." S. Rep. No. 95-903, at 4 (1978). Its "aim," to use the district court's word, JA338, was to provide "uniformity" in the provision of actual health benefits. S. Rep. No. 95-903, at 4(1978); *see also id*. (explaining that "[s]ome states have established health insurance requirements that conflict with provisions of the FEHB contracts, such as *requiring recognition of certain practitioners* not covered by" FEHBA plans) (emphasis added); *id*. (explaining that the preemption clause would "provide an immediate and permanent statutory solution to the problem of maintaining *uniformity of benefits*") (emphasis added). But, Congress also took pains to explain what § 8902(m)(1) would not preempt: It "will not provide insurance carriers under the program with exemptions from state laws and regulations governing other aspects of the insurance business." *Id*.

The distinction Congress drew here—wanting to preempt state laws that would compel FEHBA carriers to cover certain types of health benefits, while preserving traditional state laws governing other aspects of health insurance—makes eminent sense. When Congress began considering whether to amend

FEHBA to include a preemption provision, it asked the Comptroller General to identify the problems FEHBA carriers were having with state laws. In general, the Comptroller General reported that the problems were limited. After all, when FEHBA was originally passed, Congress expected that carriers would have to comply with both federal and state law requirements. *See* S. Rep. No. 95-903, at 7 (Letter of Comptroller General) (explaining that "[a]ll states regulate the health insurance business in various and varying ways" and in FEHBA's "early years . . . state law offered few if any problems for our program").

But one area of state law "presented serious problems" for FEHBA carriers: state laws that mandated "the kinds of benefits and medical practitioners that carriers doing business in these states must cover." *Id*. These laws were problematic because they "placed carriers in serious jeopardy of loss of their license in a state unless they were to approve a payment for a benefit not provided under our contract but required by state law." *Id*. For example, in Nevada FEHBA plans were compelled to "pay[] for chiropractice services . . . as required by state law," but they "do not pay for such services in any other state." *Id*. at 3.[15]

---

[15] The Comptroller's report identifies other types of "benefits" that states were beginning to require insurers to cover, including chiropractic services, acupuncture, and the treatment of mental illness, alcoholism, and drug addiction. Report of Comptroller General at 9-11. But the Comptroller also reiterated its view that FEHBA's preemption provision would not "regulate the insurance business" or "override any state regulatory scheme." *Id*. at 15. Indeed, even CSC took the position that "the States have the authority to both regulate and tax health

That tension led to the passage of § 8902(m)(1), thereby "guarantee[ing] that the provisions of [FEHBA] health benefits contracts . . . *concerning benefits or coverage*, would preempt any state and/or local insurance laws and regulations which are inconsistent with such contracts." *Id*. at 4 (emphasis added). But, it is simply wrong to assert that, as part of this concern, Congress (or the Comptroller General, for that matter) intended to preempt all state insurance laws impacting, even incidentally, FEHBA carriers or their plans. To the contrary, Congress understood that § 8902(m)(1) was "a form of limited preemption," preempting state laws "as they pertain to benefits and coverage," but not preempting "other such regulations pertaining to the regulation of insurance within the state." *Id*. at 7 (Letter of Comptroller General).[16]

* * * *

In truth, the limiting principle embedded within § 8902(m)(1) for preemption purposes is exactly what Congress said it was when it passed the

_____

insurance carriers operating under [FEHBA]." *Id.* at 15. And CSC's Deputy General Counsel at the time told FEHBA carriers that, based on FEHBA's legislative history, "State law should be controlling." *Id.* at 16.

[16] As examples of these traditional state insurance laws, Congress identified laws concerning "state premium taxes," or "state requirements for statutory reserves." S. Rep. No. 95-903, at 7 (1978) (Letter of Comptroller General). Like laws regulating reimbursement or subrogation, these laws inevitably would affect FEHB carriers, but they do not regulate decisions about which substantive benefits a carrier must cover.

amendment in 1977: laws that impose the kind of substantive coverage requirements that would bind FEHB carriers to cover benefits they would not otherwise cover. That should have carried the day here, as it has in ERISA. *See Travelers*, 514 U.S. at 664 (rejecting preemption of state law that did not impose a "substantive coverage requirement binding plan administrators").

### III.    The District Court's Rule of Preemption Violates the Supremacy Clause.

The rule adopted below—that private contractual terms can preempt State *laws*—unavoidably implicates serious constitutional concerns. It squarely pits § 8902(m)(1) against the text of the Supremacy Clause, and, left to stand, would have far-reaching and unfortunate consequences for longstanding principles of Federalism.

The Supremacy Clause of the Constitution states that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. By its terms, § 8902(m)(1) provides that certain *contractual terms* will "supersede and preempt" state laws in a particular field. There is perhaps no other express preemption clause in the modern history of this country that delegates preemptive power to contract terms, rather than duly enacted laws. There is also no constitutional authority for doing so.

The Supremacy Clause does not permit contract terms between private parties to reign "supreme" over state law. *See Arthur D. Little, Inc. v. Comm'r of Health and Hosps.*, 481 N.E. 2d 441, 452 (1985) ("[T]his court has been unable to locate authority un this or any jurisdiction which supports the proposition that a contract to which the Federal government is a party somehow constitutes Federal law for purposes of the supremacy clause."); *Yazell*, 382 U.S. 341 ("None of the cases in which [the Supreme Court] has devised and applied a federal principle of law superseding state law involved an issue arising from an individually negotiated contract."). A "Law," as used in the Supremacy Clause, "connotes a official, government-imposed policies, not the terms of a private contract." *Wolens*, 513 U.S. at 243 (1995) (O'Connor, J., concurring in part and dissenting in part) (noting also "the terms of private contracts are not laws"). And, under FEHBA, contract terms are not government-imposed. Instead, OPM "negotiates the contract terms privately with insurance providers," who are "under no obligation to enter into the contracts in the first place." *McVeigh*, 396 F.3d at 144.

For this reason, court after court has viewed FEHBA's preemption provision with suspicion. *McVeigh*, 547 U.S. at 697 (§ 8902(m)(1) is "a puzzling measure, open to more than one construction" and "a prescription of that unusual order warrants cautious interpretation"); *West Virginia ex. Rel. McGraw v. CVS Pharm.*, 748 F.Supp.2d 580, 584 (S.D. W.Va. 2010) ("FEHBA's preemption clause is

unusual inasmuch as section 8902(m)(1) provides that the terms of the FEHBA insurance plans shall preempt state law rather than giving the language of FEHBA itself preemptive effect."); *McVeigh*, 396 F.3d at 143 ("Though courts generally decide FEHBA cases as if § 8902(m)(1) were a preemption provision like any other. . .the provision is in fact quite unusual" and a "literal reading of the provision is highly problematic, and probably unconstitutional").

Embracing a "highly problematic, and probably unconstitutional" reading of FEHBA's preemption clause, *McVeigh*, 396 F.3d at 143, should have given the district pause, and led it to "construe the statute to avoid such problems." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). Had it concluded, consistent with FEHBA's legislative history and the Supreme Court's cautionary warning, that § 8902(m)(1) did not authorize contractual reimbursement terms to preempt state laws regulating reimbursement, it would have avoided the problem altogether—a result that this Court should now embrace. *Reno v. Flores*, 507 U.S. 292, 314 n.9 (1993) ("Statutes should be interpreted to avoid *serious* constitutional doubts").

## CONCLUSION

For the reasons stated above, the district court's grant of judgment on the pleadings to Blue Cross should be reversed.

Respectfully submitted,

<u>s/ Sarah E. Belton</u>

David A. Hoffman                       Sarah E. Belton
Donald W. Vasos                        PUBLIC JUSTICE, P.C.
VASOS LAW OFFICES                      555 12th Street, Suite 1230
4400 Shawnee Mission Parkway,          Oakland, CA 94607
Suite 100                              (510) 622-8150
Fairway, KS 66025
(913) 362-4400                         Matthew W.H. Wessler
                                       PUBLIC JUSTICE, P.C.
                                       1825 K Street, NW, Suite 200
                                       Washington, DC 20006
                                       (202) 797-8600


*Counsel for the Appellant*

November 19, 2014

## REQUEST FOR ORAL ARGUMENT

This appeal presents an important question of federal preemption of first impression in this Court. Appellant therefore requests oral argument.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,440 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.

s/ Sarah E. Belton
Sarah E. Belton
*Counsel for the Appellant*

November 19, 2014

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that with respect to the foregoing:

(1)  all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)  the  CM/ECF submission is an exact copy of the documents submitted to

the Clerk of this Court in hard copy; and

(3)  the digital submissions have been scanned for viruses with the most recent

version of a commercial virus scanning program, Symantec Endpoint

Protection, and according to the program are free of viruses.

<u>s/ Sarah E. Belton</u>
Sarah E. Belton
*Counsel for the Appellant*

November 19, 2014

## CERTIFICATE OF SERVICE

I certify that on November 19, 2014, I electronically filed the foregoing brief

with the Clerk of this Court using by using the appellate CM/ECF system.  The

participants in the case are registered CM/ECF users and service will be

accomplished by the appellate CM/ECF system.

<u>s/ Sarah E. Belton</u>
Sarah E. Belton
*Counsel for the Appellant*

November 19, 2014

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LEE ANN HELFRICH,

*Plaintiff,*

vs.                                                            Case No. 13-2620-EFM-JPO

BLUE CROSS AND BLUE SHIELD
ASSOCIATION and BLUE CROSS AND
BLUE SHIELD OF KANSAS CITY,

*Defendants.*

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendants' Motion for Judgment on the Pleadings (Doc. 21) for Plaintiff Lee Ann Helfrich's petition for declaratory judgment. Helfrich seeks an order declaring that Kansas law prohibits the Defendants from requiring her to reimburse them for benefits paid under a health insurance policy issued to federal employees. The Defendants maintain that under a preemption clause in the Federal Employees Health Benefits Act, the terms of the insurance contract preempt Kansas law and that Helfrich must reimburse them $76,561.88 because she recovered $100,000 from the other driver's insurance after a car accident. The Court agrees, finding that a natural reading of the statute reveals clear congressional intent to preempt any state law that prohibits reimbursement. For the following reasons, the Court grants Defendants' Motion for Judgment on the Pleadings.

## I. Factual and Procedural Background

In 2012, Plaintiff Lee Ann Helfrich was a federal employee working as an air traffic controller in Olathe, Kansas. Helfrich was enrolled in a health insurance plan offered to federal employees. Defendant Blue Cross and Blue Shield Association is a private insurance carrier that entered into a contract with the United States Office of Personnel Management to offer health insurance to federal employees under the Federal Employees Health Benefit Act (FEHBA). The plan was administered locally by Defendant Blue Cross and Blue Shield of Kansas City.

In December 2012, Helfrich was severely injured in an automobile accident. Blue Cross paid $76,561.88—after adjustments for unrelated and additional payments—to Helfrich's health care providers for medical expenses. The other driver's insurance paid Helfrich $100,000 as part of a settlement for the other driver's policy limit. The $100,000 was deposited in a trust account held by Helfrich's counsel pending the outcome of this litigation.

Helfrich's Blue Cross health insurance plan requires that the insured reimburse Blue Cross for any benefits Blue Cross paid to treat an injury caused by a third party if the insured obtains a separate recovery in connection with the injury. Blue Cross has asserted a reimbursement right of $76,561.88 against Helfrich's recovery from the other driver's insurance. Under Kansas law, such a contractual term in an insurance policy requiring reimbursement for medical expenses is prohibited. But Blue Cross contends that the FEHBA, in 5 U.S.C. § 8902(m)(1), preempts Kansas law and that this preemption clause applies to reimbursement.

Helfrich filed a Petition for Declaratory Judgment, which was removed to this Court in December 2013. Helfrich's petition requests this Court to declare that 5 U.S.C. § 8902(m)(1) does not preempt the Kansas regulation that prohibits a reimbursement clause in an insurance contract. Additionally, Helfrich seeks a declaration that the reimbursement clause in the contract

violates Kansas public policy and is unenforceable. The Defendants filed a counterclaim, asserting that Helfrich breached her obligations under the insurance plan and seeking declaratory judgment that Helfrich is obligated to reimburse the plan for all benefits paid for the treatment of injuries and that a lien exists against Helfrich's settlement proceeds. In February 2014, Blue Cross filed a Motion for Judgment on the Pleadings (Doc. 21), which is now before this Court.

## II. Legal Standard

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings after the pleadings are closed as long as the motion is made early enough not to delay trial.[1] The standard for dismissal under Rule 12(c) is the same as a dismissal under Rule 12(b)(6).[2] So to survive a motion for judgment on the pleadings, a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level," and must contain "enough facts to state a claim to relief that is plausible on its face."[3] All reasonable inferences from the pleadings are granted in favor of the non-moving party.[4] Judgment on the pleadings is appropriate when "'the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'"[5] Documents attached to the pleadings are exhibits and may be considered in deciding a Rule 12(c) motion.[6]

---

[1] FED. R. CIV. P. 12(c).

[2] *Myers v. Koopman*, 738 F.3d 1190, 1193 (10th Cir. 2013); *KMMentor, LLC v. Knowledge Mgmt. Prof'l Soc., Inc.*, 712 F. Supp. 2d 1222, 1231 (D. Kan. 2010).

[3] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[4] *Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1141 (10th Cir. 2012).

[5] *Id.* (quoting *Park Univ. Enters., Inc. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006)).

[6] *Park Univ.*, 442 F.3d at 1244; *Sprint Nextel Corp. v. Middle Man, Inc.*, 2013 WL 5876469, at *2 (D. Kan. Oct. 31, 2013).

### III. Analysis

Blue Cross argues that Helfrich must reimburse Blue Cross because Kansas' anti-reimbursement regulation is preempted by an express provision of the FEHBA that requires reimbursement. Helfrich argues that Blue Cross' motion should be denied and declaratory judgment entered in her favor because the Kansas regulation is not preempted by the FEHBA. Neither party has alleged that there are any material issues of fact that remain to be resolved. Thus, a judgment on the pleadings is appropriate.

Kansas has established a public policy against subrogation clauses in insurance contracts, and this policy includes forbidding clauses that require reimbursement of medical expenses to an insurance company. This policy is codified in the Kansas Administrative Regulations as follows:

> No insurance company or health insurer, as defined in K.S.A. 40-4602 and amendments thereto, may issue any contract or certificate of insurance in Kansas containing a subrogation clause, or any other policy provision having a purpose or effect similar to that of a subrogation clause, applicable to coverages providing for reimbursement of medical, surgical, hospital or funeral expenses.[7]

The FEHBA includes a provision, 5 U.S.C. § 8902(m)(1), that describes when state law is preempted. Under 5 U.S.C. § 8902(m)(1), the terms of a federal employee health insurance contract may preempt state law under the following conditions:

> The terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans.

Here, the health insurance contract between the Office of Personnel Management and Blue Cross and Blue Shield Association contains the following subrogation clause:

---

[7] K.A.R. 40-1-20.

(a) The Carrier's subrogation rights, procedures and policies, including recovery rights, for payments with respect to benefits shall be in accordance with the provisions of the agreed upon brochure text, which is incorporated in this Contract in Appendix A. As the member is obligated by Section 2.3(a) to comply with the terms of this Contract, the Carrier, in its discretion, shall have the right to file suit in federal court in order to enforce those rights.[8]

The contract also includes the following provision for reimbursement: "(d) The Carrier may also recover directly from the Member all amounts received by the Member by suit, settlement, or otherwise from any third party or its insurer, or the Members's insurer under an individual policy or liability insurance, for benefits which have also been paid under this contract."[9]

The Blue Cross and Blue Shield plan brochure contains a section under the heading of "When others are responsible for injuries" and is addressed to federal employees enrolled in the plan as follows:

If another person or entity, through an act or omission, causes you to suffer an injury or illness, and if we paid benefits for that injury or illness, you must agree to the provisions listed below. In addition, if you are injured and no other person or entity is responsible but you receive (or are entitled to) a recovery from another source, and if we paid benefits for the injury, you must agree to the following provisions:

● All recoveries you or your representatives obtain (whether by lawsuit, settlement, insurance or benefit program claims, or otherwise), no matter how described or designated, must be used to reimburse us in full for benefits we paid. Our share of any recovery extends only to the amount of benefits we have paid or will pay to you or your representatives. For purposes of this provision, "you" includes your covered dependants, and "your representatives" include, if applicable, your heirs, administrators, legal representatives, parents (if you are a minor), successors, or assignees. This is our right of recovery.

● We are entitled under our right of recovery to be reimbursed for our benefit payments even if you are not "made whole" for all of your damages in the recoveries that you receive. Our right of recovery is not subject to reduction for attorney's fees and costs under the "common fund" or any other doctrine.

---

[8] Answer, Doc. 6-2, at 13.

[9] Answer, Doc. 6-2, at 24.

● We will not reduce our share of any recovery unless, in the exercise of our discretion, we agree in writing to a reduction (1) because you do not receive the full amount of damages that you claimed or (2) because you had to pay attorneys' fees.

● You must cooperate in doing what is reasonably necessary to assist us with our right of recovery. You must not take any action that may prejudice our right of recovery.

● If you do not seek damages for your illness or injury, you must permit us to initiate recovery on your behalf (including the right to bring suit in your name). This is called subrogation.[10]

Here, the question is whether the terms of the insurance contract preempt the Kansas law prohibiting subrogation and reimbursement.[11] For preemption to apply under the FEHBA, the contract terms must 1) "relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits)" and 2) the state law must relate to health insurance or plans.[12] In other words, the contract terms must relate to coverage, relate to benefits, or relate to payments with respect to benefits. If not, then preemption does not apply.

The parties agree that the state law—in this case, K.A.R. 40-1-20—relates to health insurance, so the second requirement for preemption is met. The parties disagree about whether the contract terms relate to coverage or benefits. Blue Cross emphasizes that the contract terms, at least, relate to payments with respect to benefits. Helfrich maintains that there is no preemption under the plain language of the statute, and even if there are two plausible readings of the statute, the presumption against preemption essentially breaks the tie in her favor.

---

[10] Answer, Doc. 6-4, at 128-29 (2012 plan brochure); Answer, Doc. 6-5, at 138-39 (2013 plan brochure).

[11] The Court notes that other courts have expressed concern that the concept of a contractual term having the power to preempt state law may be unconstitutional. *See Empire Healtchoice Assurance, Inc. v. McVeigh*, 396 F.3d 136, 143 (2d Cir. 2005). Here, Helfrich does not allege that the statute is unconstitutional, so the Court need not address the issue.

[12] 5 U.S.C. § 8902(m)(1).

Without deciding, the U.S. Supreme Court briefly addressed the issue in *Empire Healthchoice Assurance v. McVeigh*,[13] which concerned whether there was federal-court jurisdiction for a suit for reimbursement initiated by an insurance carrier against an enrollee.[14] In *Empire*, the Court briefly addressed the preemptive powers of 5 U.S.C. § 8902(m)(1) but decided it was not necessary to choose between two plausible constructions to decide the jurisdictional issue.[15] In *Empire*, one of the issues was whether the insurance carrier's claim arose under federal law for federal jurisdiction under § 1331 despite the FEHBA expressly conferring federal jurisdiction only for suits "against the United States."[16] For federal jurisdiction to exist, the insurance carrier's contractual right must be a right that Congress intended to be federal in nature—in other words, a clear intent that the text of the federal law renders inoperative any and all state laws that affect federal employee benefit plans in some way.[17] The Court concluded that there was no federal-court jurisdiction because § 8902(m)(1) does not completely preempt all state laws that could bear on a federal employee benefit plan.[18] In reaching this conclusion, the Court considered whether Congress intended for § 8902(m)(1) to be so broad as to completely displace all ordinarily applicable state law.[19] The Court concluded that it did not.[20]

---

[13] 547 U.S. 677 (2006).

[14] In *Empire*, the U.S. Supreme Court held that a lawsuit filed by a health insurance carrier seeking reimbursement from a beneficiary lacked federal question jurisdiction. *Id.* at 683.

[15] *Id.* at 697-98.

[16] *Id.* at 686, 690-93.

[17] *Id.* at 693-98.

[18] *Id.* at 699.

[19] *Empire,* 547 U.S. at 698.

[20] *Id.*

As part of its analysis, the Court noted that there are two "plausible constructions" of the statute for and against a finding of preemption:

> Section 8902(m)(1) is a puzzling measure, open to more than one construction, and no prior decision seems to us precisely on point. Reading the reimbursement clause in the master OPM-BCBSA contract as a condition or limitation on "benefits" received by a federal employee, the clause could be ranked among "[contract] terms . . . relat[ing] to . . . coverage or benefits" and "payments with respect to benefits," thus falling within § 8902(m)(1)'s compass. On the other hand, a claim for reimbursement ordinarily arises long after "coverage" and "benefits" questions have been resolved, and corresponding "payments with respect to benefits" have been made to care providers or the insured. With that consideration in view, § 8902(m)(1)'s words may be read to refer to contract terms relating to the beneficiary's entitlement (or lack thereof) to Plan payment for certain health-care services he or she has received, and not to terms relating to the carrier's postpayments right to reimbursement.[21]

The Court concluded that there was no need to choose one of the two constructions to answer the question before it because "even if FEHBA's preemption provision reaches contract-based reimbursement claims, that provision is not sufficiently broad to confer federal jurisdiction."[22] In other words, the Court said that the statute could be read to preempt state law but a federal court did not have jurisdiction to do so in that situation. The statute did not expressly confer federal-court jurisdiction and it did not indicate that Congress intended for the statute to completely displace all state laws in this area, which could have been another avenue to jurisdiction. Here, federal-court jurisdiction is based on diversity under 28 U.S.C. § 1332 and is not in question.[23]

---

[21] *Id.* at 697-98 (internal citations omitted).

[22] *Id.* at 698.

[23] Helfrich resides in Kansas, Blue Cross and Blue Shield Association is based in Illinois, Blue Cross and Blue Shield of Kansas City is based in Missouri, and the parties have stipulated that the amount in controversy is $76,561.88. Joint Stipulation Regarding Amendment to Pleadings, Doc. 20.

Before *Empire*, courts consistently held that 5 U.S.C. § 8902(m)(1) preempted state laws that prohibited subrogation or reimbursement.[24] After *Empire*, courts have been split. One federal district court has concluded that preemption exists, retreating from its own contrary conclusion.[25] But two state appellate courts recently held that the statute does not preempt state law.[26] The rationales for finding for or against preemption have varied.

The two state court cases introduced the presumption against preemption as a consideration in choosing the second of *Empire*'s two plausible interpretations, supporting the conclusion against preemption and in favor of state law. In *Nevils v. Group Health Plan, Inc.*,[27] the Missouri Supreme Court noted that when two plausible readings of a statute are possible, a court has the "duty to accept the reading that dis-favors preemption."[28] The Missouri court noted that *Empire* recognized plausible, alternate interpretations and concluded that the presumption against preemption was implicated.[29] But the court ultimately based its decision against preemption on statutory interpretation of the term "relate to," concluding that the term "must be construed as requiring a direct and immediate relationship to the insurance coverage and benefits

---

[24] *See Blue Cross and Blue Shield of Illinois v. Cruz*, 396 F.3d 793, 799 (7th Cir. 2005), *vacated and remanded on jurisdictional grounds*, 548 U.S. 901 (2006); *Medcenters Health Care v. Ochs*, 26 F.3d 865, 867 (8th Cir. 1994); *NALC Health Benefit Plan v. Lunsford*, 879 F. Supp. 760, 763 (E.D. Mich. 1995); *Thurman v. State Farm Mutual Auto. Ins. Co.*, 598 S.E.2d 448, 451 (Ga. 2004); *Aybar v. New Jersey Transit Bus Operations*, 701 A.2d 932, 937 (N.J. Super. Ct. App. Div. 1997); *Buatte v. Gencare Health Sys., Inc.*, 939 S.W.2d 440, 442 (Mo. App. 1996).

[25] *Calingo v. Meridian Res. Co., LLC*, 2013 WL 1250448, at *2, *4 (S.D.N.Y. Feb. 20, 2013) (unpublished).

[26] *Nevils v. Group Health Plan, Inc.*, 418 S.W.3d 451, 457 (Mo. 2014); *Kobold v. Aetna Life Ins. Co.*, 309 P.3d 924, 928 (Ariz. App. 2013), *rev. denied* (Mar. 21, 2014).

[27] 418 S.W.3d 451 (Mo. 2014).

[28] *Id.* at 454 (quoting *Bates v. Dow AgroScience, LLC*, 544 U.S. 431, 449 (2005)).

[29] *Id.* at 454-55.

at issue."[30] The court concluded that the carrier's contingent right to reimbursement bore "no immediate relationship to the nature, provision or extent" of the enrollee's insurance coverage and benefits.[31] As a result, the court held that the FEHBA did not preempt Missouri law.[32] The Arizona Court of Appeals reached the same result using a similar analysis.[33]

### a) Presumption Against Preemption

The Court first addresses the presumption against preemption, which has been a point of contention among members of the U.S. Supreme Court. Recently, four members signed on to a concurring opinion that disavowed the use of the presumption in express preemption provisions, calling the Court's reliance on the presumption "sporadic at best" in the past two decades.[34] In *CTS Corp. v. Waldburger*,[35] the Court summarized the presumption against preemption, noting that it provided "additional support" for its statutory interpretation against preemption:

> "[B]ecause the States are independent sovereigns in our federal system," the Court "'assum[es] that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"
>
> "It follows that "when the text of a preemption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" That approach is "consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety."
>
> "The effect of that presumption is to support, where plausible, "a narrow interpretation" of an express pre-emption provision, especially "when Congress

---

[30] *Id.* at 456.

[31] *Id.* at 457.

[32] *Nevils*, 418 S.W.3d at 457.

[33] *See Kobold*, 309 at 927-28 (concluding that the contract provision created a contingent right to repayment but "bears no immediate relationship to the scope of [the plaintiff's] coverage under the Plan or his receipt of benefits under that coverage").

[34] *See CTS Corp. v. Waldburger*, 134 S.Ct. 2175, 2189 (2014) (Scalia, J., concurring).

[35] 134 S.Ct. 2175.

has legislated in a field traditionally occupied by the States." The presumption has greatest force when Congress legislates in an area traditionally governed by the States' police powers.[36]

The same author, Justice Kennedy, recently expanded on the principle behind the idea that courts ordinarily accept a plausible reading that disfavors preemption:

> This principle is best understood, perhaps, not as a presumption but as a cautionary principle to ensure that pre-emption does not go beyond the strict requirements of the statutory command. The principle has two dimensions: Courts must be careful not to give an unduly broad interpretation to ambiguous or imprecise language Congress uses. And they must confine their opinions to avoid overextending a federal statute's pre-emptive reach. Error on either front may put at risk the validity and effectiveness of laws that Congress did not intend to disturb and that a State has deemed important to its scheme of governance.[37]

The Supreme Court also has emphasized that "the purpose of Congress is the ultimate touchstone in every pre-emption case."[38] Considering these principles, it seems clear that the Court "ordinarily" should accept a plausible reading that avoids preemption. But the presumption against preemption can be overcome if the congressional purpose to preempt state law is clear. In other words, the Court does not have a duty to automatically accept any plausible reading that disfavors preemption. Rather, congressional intent is the ultimate controlling factor. "Congressional intent is discerned primarily from the statutory text."[39]

In *CTS Corp.*, the Supreme Court resolved a preemption issue from the text and structure of a statute.[40] It is instructive that the presumption against preemption was discussed only for

---

[36] *Id.* at 2188 (majority opinion) (internal citations omitted).

[37] *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S.Ct. 2247, 2261 (2013) (Kennedy, J., concurring).

[38] *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronics, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

[39] *CTS Corp.*, 134 S.Ct. at 2185.

[40] *Id.* at 2188.

"additional support" in dicta after resolving the issue through a natural reading of the statute.[41] For this reason, the Court first will attempt to resolve the issue through a natural reading of the FEHBA to ascertain whether there is clear congressional intent to preempt state law.

**B) Statutory Interpretation**

Again, the FEHBA provision at issue is § 8902(m)(1), which reads as follows:

> The terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issue thereunder, which relates to health insurance or plans.[42]

Specifically, the issue is whether the reimbursement terms in the contract "relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits)." Parsing these words to the most relevant terms, the Court examines whether the reimbursement terms "relate to the . . . extent of . . . payments with respect to benefits." If so, then the contract terms preempt Kansas state law.

Earlier this year, the U.S. Supreme Court restated its recognition that "the key phrase 'related to' expresses a 'broad pre-emptive purpose.'"[43] The ordinary meaning of "relate to" is a "broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association or connection with.'"[44] The Court also has noted that the words "relate to" have a "broad scope" and an "expansive sweep" and that the term is "broadly worded," "deliberately

---

[41] *Id.*

[42] 5 U.S.C. § 8902(m)(1).

[43] *Northwest, Inc. v. Ginsberg*, 134 S.Ct. 1422, 1428 (2014) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)).

[44] *Morales*, 504 U.S. at 383 (quoting Black's Law Dictionary 1158 (5th ed. 1979)).

expansive," and "conspicuous for its breadth."[45] In the ERISA context, the Court concluded that a state law "relates to" an employee benefit plan "'if it has a connection with, or reference to, such a plan.'"[46] Under a "broad common-sense meaning," a state law may "relate to" a benefit plan if "the effect is only indirect" or even if the law is not specifically designed to affect such a plan.[47] Courts have noted that "relate to" has the same meaning in the FEHBA context as it does in the ERISA context.[48] Similarly in other contexts, the Court has adopted the "connection with or reference to" standard for identical "relates to" language of other federal statutes.[49]

Likewise, this Court examines whether the contractual reimbursement terms have a connection with or reference to the extent of payments with respect to benefits. Further, "with respect to" is another way of stating "relating to."[50] Taken a step further, the question becomes whether the reimbursement terms have a connection with the extent of payments related to benefits. Notably, the statutory language does not limit "payments" to payments made by the insurance carrier, the implication being that "payments with respect to benefits" may be read to include payments owed by the insured back to the carrier in the form of reimbursement. And because "reimburse" means "to repay," the Court finds that the contractual terms of reimbursement certainly have a connection with the extent of payments related to benefits. Therefore, a natural reading of the statutory language reveals that Congress intended for a

---

[45] *Id*. at 383-84.

[46] *Id*. at 384.

[47] *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990).

[48] *See Blue Cross and Blue Shield of Florida, Inc. v. Dept. of Banking and Fin.*, 791 F.2d 1501, 1504 (11th Cir. 1986) ("We see no meaningful difference on the face of the statute between Congress' use of "relates to" in ERISA and its use of the same words in section 8902(m).").

[49] *See Morales*, 504 U.S. at 384.

[50] The American Heritage Dictionary 1052 (2d. College Ed. 1985).

contract containing terms of reimbursement to preempt state law because, by definition, reimbursement relates to the extent of payment of benefits as required by § 8902(m)(1).

This interpretation is consistent with the majority of courts that have addressed the question.[51] The two state courts that found against preemption did so primarily on the basis that the term "relate to" must be construed as "requiring a direct and immediate relationship" to the insurance coverage or benefits.[52] Under this standard, these courts concluded that the carrier's reimbursement right bears "no immediate relationship" to coverage or benefits.[53] This standard derives from two cases that made the point that there is a limit as to how broadly "relate to" should be construed—that the term could be extended to "the furthest stretch of its indeterminacy" such that anything could "relate to" anything else.[54] But neither of those two cited cases introduced a "direct and immediate relationship" standard.[55] Nor has the U.S. Supreme Court. To the contrary, the U.S. Supreme Court has stated that an indirect effect is enough to show a relationship for preemption purposes.[56] While recognizing that there must be some limit to how far "relate to" should be construed, the Court declines to adopt the narrow

---

[51] *See Cruz*, 396 F.3d at 798 ("An enrollee's reimbursement obligation after recovery from a third party affects the amount of net benefits received from the carrier, so it certainly satisfies the literal definition of being "related to" the extent of coverage or benefits."); *Medcenters Health Care*, 26 F.3d at 867 (affirming holding "that the contract's language was sufficiently clear to require reimbursement"); *NALC Health Benefit Plan*, 879 F. Supp. at 763 ("By definition, the reimbursement provision within this Plan 'relate[s] to the nature or extent of coverage or benefits.'"); *Calingo*, 2013 WL 1250448, at *4 (concluding that "the enforcement of subrogation and reimbursement provisions in FEHBA contracts is integral to the overall administration of benefits plans under the FEHBA, and thus necessarily 'relate to' benefits or coverage for purposes of triggering FEHBA's preemption provision.").

[52] *Nevils*, 418 S.W.3d at 456; *Kobold*, 309 P.3d at 927.

[53] *Nevils*, 418 S.W.3d at 457; *Kobold*, 309 P.3d at 928.

[54] *See Kobold*, 309 P.3d at 927 (citing *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995); *Roach v. Mail Handlers Benefit Plan*, 298 F.3d 847, 849-50 (9th Cir. 2002)).

[55] *See Travelers*, 514 U.S. at 655-56; *Roach*, 298 F.3d at 849-50.

[56] *See Ingersoll-Rand*, 498 U.S. at 139.

-14-

"direct and immediate relationship" standard relied on by the Missouri and Arizona courts. The Court notes that the Tenth Circuit also has construed "relate to" as meaning having "a connection with or reference to" while recognizing that this standard "is not limitless."[57] This reading makes the congressional purpose sufficiently clear to overcome the presumption against preemption.

### c) Congressional Purpose

Ultimately, the cited source of the state courts' "direct and immediate relationship" standard concluded that attempting to measure relations and connections was unhelpful and chose to look instead to the objectives of the federal statute at issue.[58] Here, the congressional purpose behind FEHBA's preemption clause provides additional support for finding in favor of preemption. The U.S. Supreme Court has noted that the purpose of the preemption clause in § 8902(m)(1) is to "ensure uniform coverage and benefits" for federal employees.[59] The aim of the statute was to provide for a uniform, nationwide interpretation of health insurance plans for all federal employees so that issues such as reimbursement would not vary depending on which state the insured lives.[60] Therefore, a finding that Helfrich may keep Blue Cross' payment under Kansas law would frustrate the congressional purpose of nationwide uniformity because another employee under another state's law would be required to reimburse Blue Cross under the same

---

[57] *See Carroll v. Los Alamos Nat. Sec., LLC*, 407 Fed. Appx. 348, 352 (10th Cir. 2011).

[58] *See Travelers*, 514 U.S. at 656 ("We simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive.").

[59] *See Empire*, 547 U.S. at 686 (citing H.R. Rep. No. 95-282, at 1 (1977)).

[60] *See Weight Loss Healthcare Ctrs. of Am., Inc., v. Office of Pers. Mgmt.*, 655 F.3d 1202, 1206 (10th Cir. 2011) ("Further, not only are the advantages of a uniform, nationwide interpretation of these plans manifest, but the legislative history of FEHBA shows that Congress was motivated by those advantages when it adopted 5 U.S.C. § 8902(m)(1), which preempts the application of state law to the federal plans. Indeed the title of the law adding § 8902(m)(1) to the FEHBA is 'An Act to Amend [the FEHBA] to establish uniformity in Federal employee health benefits and coverage by preempting certain State or local laws which are inconsistent with such contracts, and for other purposes.'").

terms of the contract. Keeping in mind that congressional purpose is the ultimate touchstone in every preemption case, the Court concludes that § 8902(m)(1) preempts Kansas law. As a result, the Court declares that Helfrich must reimburse Blue Cross $76,561.88 and that a lien exists for the same amount against Helfrich's settlement proceeds.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Judgment on the Pleadings (Doc. 21) is hereby **GRANTED**.

**IT IS SO ORDERED**.

Dated this 5th day of August, 2014.


_Eric F. Melgren_
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

-16-